PER CURIAM
The City of Harrisonville filed a petition for damages against McCall Service Stations d/b/a Big Tank Oil, Fleming Petroleum Corporation, and the Missouri Petroleum Storage Tank Insurance Fund after the City discovered that petroleum from a service station’s underground storage tank had leaked and contaminated the soil where the City was working on a sewer upgrade project. The City alleged counts of nuisance and trespass against McCall, the service station’s previous owner, arid Fleming, the service station’s current owner. The City also alleged counts of negligent and fraudulent misrepresentation against the Fund because the increased construction costs resulting from the contamination in the City’s sewer easement were not paid from the Fund. The jury returned verdicts in favor of the City on all counts and awarded the City compensatory and punitive damages against McCall, Fleming, and the Fund. The circuit court then remitted the punitive damages awarded against the Fund. McCall, Fleming, and counsel for the Fund appealed. The City cross-appealed from the remittitur of the punitive damages award.
The nuisance and trespass instructions submitted to the jury were not erroneous. McCall and Fleming failed to establish that prejudice resulted from the inclusion of the “consequential damages” language in the nuisance and trespass instructions. McCall and Fleming also failed to establish that the nuisance and trespass instructions gave the jury a roving commission on damages or gave the jury an opportunity to award improper economic damages. Likewise, the circuit court did not err in refusing to remit the compensatory damages awarded against McCall and Fleming in that substantial evidence in .the record supported the compensatory damages award. Accordingly, the judgment is af *743 firmed with respect to the damages awarded against McCall and Fleming.
The award of punitive damages against the Fund, however, was erroneous. The City’s claims against the Fund are not cognizable under the Fund’s enabling statutes. Furthermore, the Fund cannot be liable for its own conduct because the Fund’s statutory structure is such that the Fund is merely an account and only its Board of Trustees is responsible for the administration and operation of the.Fund. It follows that, because the City failed to allege cognizable claims against the Fund for actual or compensatory damages, it also cannot recover punitive damages against the Fund. Accordingly, the punitive damages award against the Fund is reversed. This Court, however, will- not disturb the compensatory damages awarded against the Fund given that counsel for the Fund did not seek relief on appeal from the compensatory damages award. Moreover, because counsel for the Fund failed to raise the argument that the Fund’s trustees — not the Fund itself — are the proper parties until after the jury rendered its verdict and because the allegations in the City’s petition may state a cause of action against the Fund’s Board of Trustees for the actions of its agents, the cause is remanded in the interest of fairness and justice. The judgment against the Fund is affirmed in all other respects.
I. Factual and Procedural Background[1]
McCall owned a gas station in Harrison-ville that had an underground petroleum storage tank system. In September 1997, McCall discovered that its tank system was leaking and submitted notice of this claim against the Fund. The Fund is a special trust fund created by the legislature, in section 319.129,[2] to provide insurance to service station owners for the cleanup costs associated with spills and leaks from underground petroleum storage tanks. Representatives of the Fund investigated the leak and determined that a significant amount of gasoline had leaked into the soil surrounding McCall’s tank system.
McCall and the Board of Trustees for the Fund hired Bob Fine, an environmental engineer, to determine the extent of the leak. In October 1997, Mr. Fine notified • the Department of Natural Resources that McCall’s leaking tank system had caused petroleum contamination to migrate offsite toward a nearby creek. Mr. Fine prepared a plan to contain the leak by installing monitoring.wells on the streets contiguous to McCall’s service station. McCall subsequently sold the service station to Fleming.
Tn 2003, the City decided to upgrade its sewer system to accommodate its growing population. The City’s residents approved a bond issue for the multi-million dollar sewer upgrade project. The City hired George Butler & Associates, a local engineering firm, to design the project and prepare ,a scope of services so that the construction work could be let for competitive bidding.
Rose-Lan Construction won the bidding process and was engaged by the City to complete the sewer project. During construction, Rose-Lan encountered contaminated soil adjacent to Fleming’s service station. Because Rose-Lan did not have expertise in remediation of contaminated soil, it could not complete'that portion of the sewer project.
*744 The City notified the department of natural resources of the contaminated soil and was informed that the Fund’s Board of Trustees had retained Mr. Fine to monitor the contamination since 1997. The Fund’s Board of Trustees then hired Mr. Fine to determine whether gasoline from Fleming’s service station was responsible for the soil contamination in the City’s sewer easement. Mr. Fine confirmed that the leak from Fleming’s underground storage tank was the source of the contamination.
The City began discussions with Mr. Fine regarding the best way to address the contaminated soil and to complete construction of the sewer upgrade project. The City’s engineer, Ted Martin, estimated that to completely remove and replace the contaminated soil would cost in excess of $500,000. Mr. Fine, on behalf of the Fund, suggested that a more cost-effective approach would be to leave the contaminated soil in place and install petroleum-resistant pipe and-fittings. BV Construction submitted a bid of $190,226.38 to install the petroleum resistant pipe according to Mr. Fine’s suggested approach.
Pat Vuchetich, the Fund’s third-party administrator, concluded that Mr. Fine and BV Construction’s estimate was too high and made efforts to find a cheaper bid. Mr. Vuchetich contacted multiple companies and determined that Midwest Remediation was best suited for the project.based on his prior experience with the company. Mr. Vuchetich requested that Midwest Remediation prepare a bid and assisted Midwest Remediation’s project manager, Shaun Thomas, in preparing the bid by making suggestions about specific cost items. Midwest Remediation’s bid was for $175,161.41, more than $15,000 lower than the bid submitted by BV Construction.
On April 13, 2004, Mr. Vuchetich forwarded Midwest Remediation’s bid to Carol Eighmey, the executive director of the Fund’s Board of Trustees. Mr. Vuchetich stated that the exposure to the Fund would be $135,571 after subtracting Rose-Lan’s estimated costs for the relevant section of pipe that the City would avoid because Rose-Lan would not be constructing that portion of the project. Mr. Vuche-tich informed Ms. Eighmey that he would tell the City that Midwest’s costs were reasonable. .
■ On April 15, 2004, the City held a meeting for all parties involved in the remediation project. Mr. Vuchetich represented the Fund at the meeting. The City was represented by the City administrator, Dianna Wright, the City attorney, Steve Mauer, and Mr. Martin, the City engineer. Mr. Thomas of Midwest Remediation and William Rextroat of Rose-Lan were also in attendance.
At the meeting, Mr. Vuchetich presented Midwest Remediation’s bid and informed the City that the bid was reasonable. Mr. Vuchetich also expressed concerns that Rose-Lan’s initial bid of $19,061.31 for installing the relevant section of pipe was too low. In response, Rose-Lan revised its bid to $25,138.41. Rose-Lan’s revised bid reduced the amount of the contamination-related costs for which the Fund would be responsible. Mr. Vuchetich also stated, on behalf of the Fund, that both the City and George Butler & Associates should share some of the additional costs of the cleanup project based upon their failure to discover the soil. contamination 'before preparing the sewer construction plan. The City responded that the Fund should address those concerns with George Butler & Associates, not with the City. Ms. Wright, Mr. Martin, and Mr. Rextroat ’ left the meeting with the understanding that Mr. Vuchetich, on behalf of the Fund, wanted the City to *745 hire Midwest Remediation for the remediation project and that the City would be reimbursed from the Fund for' the cost of Midwest Remediation’s work, less the amount that the City would otherwise have paid to Rose-Lan for the affected portion of the sewer project. .
Various discussions between the City and Mr. Vuchetich occurred over the following months. Mr. Vuchetich, on at least two occasions, made an offer of $50,000 to the City to settle the Fund’s liability. On August 3, 2004, the City authorized Rose-Lan to subcontract with Midwest Remediation to ‘ install the petroleum-resistant pipes. The following day, the City’s attorney sent a letter to Mr. Vuchetich stating that the City was going forward in reliance on his promise that the Fund would pay the full amount of Midwest Remediation’s costs.
The City was not reimbursed from the Fund for the costs of Midwest Remediation’s work. As a result, the City filed suit against the Fund for fraudulent and negligent representation, alleging that the City had hired Midwest Remediation in reliance on Mr. Vuchetich’s promise that the cost of Midwest Remediation’s work would be paid from the Fund. The City also asserted claims for nuisance and trespass against McCall and Fleming based on the migration of petroleum contamination from the underground tank system.[3] The City sought compensatory and punitive damages from each defendant.
A jury trial was conducted on the City’s claims. During trial, the circuit court granted the City’s motion for directed verdict on liability against McCall and Fleming. This left only the issue of damages for jury determination on the City’s nuisance and trespass claims against McCall and Fleming and the issue of liability and damages on the City’s claims of negligent and fraudulent misrepresentation against the Fund. McCall and Fleming made oral and written motions for directed verdict that were overruled by the circuit court. The Fund made only an oral motion for directed verdict at the close of all evidence that the circuit court also overruled.
The jury returned a verdict for the City on all claims. The jury awarded $172,100.98 in compensatory damages against McCall, Fleming, and the Fund. The jury also awarded $100 in punitive damages against McCall and Fleming and $8 million in punitive damages against the Fund. The circuit court entered its judgment accordingly.
McCall, Fleming, and counsel for the Fund each filed post-trial motions. Counsel for the Fund argued that the $8 million punitive damages award exceeded the cap on punitive damages in section 510.265.1(2) and that the punitive damages award violated the due process requirements of the United States and Missouri constitutions. In refusing to apply the statutory damages cap, the circuit court found that the City’s cause of action accrued before the statute-ry cap’s enactment in 2005. Nevertheless, the circuit court remitted the punitive damages award to $2.5 million on due process grounds. The circuit court overruled the remaining post-trial motions.
McCall, Fleming, and counsel for the Fund appeal. The City cross-appeals the circuit court’s remitter. of the punitive damages award. After an opinion by the court of appeals, the case was transferred to this Court.[4] Mo. Const, art. V. see. 10.
*746 II. The Jury Instructions Were Not Erroneous
In their first point, McCall and Fleming assert that the circuit court erred by submitting instruction Nos. 7 and 9, which pertained to the City’s nuisance and trespass claims, respectively, because the instructions erroneously permitted the recovery of consequential damages. “Whether a jury was instructed properly is a question of law this Court reviews de novo.” Hervey v. Missouri Dep’t of Corrections, 379 S.W.3d 156, 159 (Mo.banc 2012). This Gourt conducts its review in the light most favorable to the record and will find submission of an instruction proper “if the instruction- is supported by any theory[.]” Id. “The party challenging the instruction must show that the offending instruction misdirected, misled, or confused the jury, resulting* in prejudice to the party challenging the instruction.” Id. This Court will reverse instructional errors “only if the error resulted in prejudice that materially affects the merits of the action.” Id.
If a Missouri approved instruction (MAI) is applicable in a particular case, that instruction must be given “to the exclusion of any other instruction on the same subject.” Rule 70.02(b). “Any deviation from an approved MAI instruction is presumed prejudicial error unless the contrary is shown.” Kenney v. Wal-Mart Stores, Inc,, 100 S.W.3d 809, 813 (Mo.banc 2003). MAIs, however, do not exist for every particular legal issue. When there is no applicable MAI, the instruction given “shall be simple; brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts.’’' Rule 70.02(b). Although McCall and Fleming’s point relied on challenges the jury instructions submitted on both the Citys'nuisance claim and trespass claim, the authority on which McCall and Fleming rely addresses only the damages recoverable in a common law trespass action. McCall and Fleming do not cite any authority to support their claim that consequential damages are not recoverable in a common law nuisance action. “Where a party fails to support a contention with relevant authority or argument beyond conclusions, the point is considered abandoned.” Beatty v. State Tax Comm’n, 912 S.W.2d 492, 498-99 (Mo.banc 1995)! McCall and Fleming, therefore, abandoned their argument that the circuit court erroneously instructed the jury, that consequential damages were recoverable under the City’s nuisance claim. Because the jury was instructed on and awarded consequential damages under the nuisance claim, no prejudice resulted from the trespass instruction also including the consequential damages language. Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 91 (Mo. banc 2010).
‘ McCall and Fleming also assert that the circuit court improperly submitted damages instructions based on MAI 4.02 rather than MAI 4.01. McCall and Fleming, however, did not object to the instructions on such grounds. Rule 70.03 provides: “No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.” The only objection raised by McCall and Fleming was that the language regarding consequential damages should not have been included in the instruction. In fact, McCall and Fleming modeled their instructions after MAI *747 4.02. Accordingly, because McCall and Fleming failed to make the specific objection to the instructions they are now claiming to be error, the issue is not preserved for appellate review. See Howard v. City of Kansas City, 332 S.W.3d 772, 790 (Mo. banc 2011).
McCall and Fleming further assert that the inclusion of the phrase “consequential damages” in instruction Nos. 7 and 9 gave the jury a “roving commission.” “A roving commission occurs when an instruction assumes.a disputed fact or submits an abstract legal question that allows the jury to roam freely through the evidence and choose any facts which suit its fancy or its perception of logic to impose liability.” Klotz v. St. Anthony’s Med. Ctr., 311 S.W.3d 752, 766 (Mo.banc 2010) (internal quotations omitted). In determining whether a jury instruction failed to give the jury meaningful guidance but, instead, constituted a roving commission, “[t]he issue is whether the phrase as used in the verdict director was misleading in the context of the evidence at trial.” Id. at 767. “Where the testimony in a ease explains a phrase used in the verdict director, there is no ‘roving commission.’ ” Id.
In this case, the testimony at trial made clear precisely what damages the City was seeking to collect as a result of the petroleum contamination, Dianna Wright, the City’s former administrator, testified that the City was required to hire Midwest Remediation to install petroleum-resistant piping in the area where the contamination had been discovered because Rose-Lan was not qualified to deal with the petroleum contamination. Ms. Wright further explained that . Midwest Remediation charged the City $155,257,98 more than Rose-Lan had contracted to charge for completion of the sewer upgrade project in the contaminated area. Ms. Wright testified that these additional costs were a direct result of the sod contamination. She also testified that the City incurred additional costs of $4,660 for soil testing to determine the scope of the contaminátion and $12,183 in additional fees to George Butler & Associates due to the increased scope of the sewer project caused by the soil contamination. Ms. Wright testified that the City’s damages were the sum of these costs, $172,100.98, which directly resulted from the soil contamination.
Therefore, Ms. Wright’s testimony establishes that the City incurred increased costs of $172,100.98 to complete the sewer upgrade project as a direct result , of the contamination for which McCall and Fleming are responsible. None of the costs for which the City sought reimbursement would have been incurred had the City not encountered petroleum-contaminated soil. The increased costs to which Ms. Wright testified are the costs for which the City sought compensation in its closing arguments, and the jury awarded the City compensatory damages in this precise amount. The City was entitled to recover these costs, which were proximately caused by the trespass of contaminants into the City’s sewer easement. Under these circumstances, the reference to “consequential damages” in instruction Nos. 7 and 9 was sufficiently definite to inform the jury of the legal standard to be applied, and these instructions did not constitute a prohibited “roving commission.”
McCall and Fleming also assert that instructions Nos. 7 and 9 were erroneous because the instructions allowed the City to seek recovery of “economic damages.” In support of their argument, McCall and Fleming rely on the following exchange during.Ms. Wright’s cross-examination by their counsel:
Q. ... So ... the difference in the money you paid [to Midwest Remediation] and the money that Rose-Lan said they *748 would have spent; that represented the loss of the benefit of your good bargain with Rose-Lan; is that your understanding?
A. That’s my understanding.
McCall and Fleming claim that this exchange establishes that the City was seeking “benefit of the bargain” damages rather than recovery of only those costs that were directly attributable to the petroleum contamination.
By "agreeing with McCall and Fleming’s counsel that part of the City’s damages reflected “the loss of the benefit of [the City’s] good bargain with Rose-Lan,” Ms. Wright was merely testifying that, due to the petroleum contamination, the City coiild' no longer construct this portion of the sewer upgrade project at the lower costs to which Rose-Lan had agreed but, instead, had to hire a specialized contractor to perform part of the sewer upgrade project at a much higher cost. Although McCall and Fleming’s counsel asked his questions in terms of the “benefit of the bargain,” Ms. Wright’s response is consistent with the remainder of her testimony that the City could have had the relevant work performed at a much lower price but for the discovery of the contamination. The isolated excerpt from Ms. Wright’s testimony, therefore, does not establish that the instructions permitted the City to seek “benefit of the bargain” damages.
III. Competent Evidence Supports the Compensatory Damages Award
In their second point, McCall and Flething argue that the circuit court abused its discretion by failing to sustain their motions for a directed verdict and for judgment notwithstanding the verdict, which sought to limit the City’s compensatory damages' to $72,009.89. McCall and Fleming argue that there was no competent evidence that the damages attributable to the contamination exceeded that amount.
“The standard of review for the denial of a judgment notwithstanding the verdict (JNOV) is essentially the same as review of the denial of a motion for directed verdict.” All Am. Painting, LLC v. Fin. Solutions & Assocs., Inc., 315 S.W.3d 719, 723 (Mo.banc 2010).
When reviewing a circuit court’s denial of a judgment notwithstanding the verdict, this Court must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability. Evidence is viewed in the light most favorable to the jury’s verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences. This Court will reverse the jury’s verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury’s conclusion.
Smith v. Brown & Williamson Tobacco Corp., 410 S.W.3d 623, 630 (Mo.banc 2013) (internal citation and quotation omitted).
McCall and Fleming claim that the only evidence on which the jury could have relied to determine the City’s damages was the testimony of Mr. Thomas, who prepared Midwest Remediation’s bid for the remediation project. Mr. Thomas testified that only $72,009.98 of Midwest Remediation’s bid of $175,161.44 was directly attributable to the soil contamination at the site. This claim ignores the other evidence presented by the City to support its claim for damages.
Ms. Wright testified that all of the damages it was seeking to recover resulted from the necessity to hire Midwest Remediation to construct a portion of the sewer upgrade project that Rose-Lan was not qualified to perform because of the *749 petroleum contamination. Furthermore, the City’s evidence indicated that representatives of the Fund recommended Midwest Remediation and viewed its bid to install the petroleum-resistant pipes for $155,257.98 more than Rose-Lan’s contract charged as “reasonable” for the work needed. Even if Mr. Thomas’ testimony were viewed as inconsistent with the City’s other evidence, any inconsistency was for the jury to resolve. Accordingly, viewing the evidence in the light most favorable to the verdict and disregarding any evidence to the contrary, the circuit court did not err in overruling McCall and Fleming’s motion for directed verdict or motion for JNOV.
IV. Remittitur of Compensatory Damages
In their third point, McCall and Fleming assert that the circuit court abused its discretion by not remitting the compensatory damages award based on Mr. Thomas’s testimony that Midwest Remediation’s contamination-related costs were only $72,009.98. Because substantial evidence supported the jury’s compensatory damage award, the circuit court did not abuse its discretion in refusing to remit the compensatory damages awarded against McCall and Fleming. Badahman v. Catering St Louis, 395 S.W.3d 29, 39-40 (Mo.banc 2013).
V. The Evidence Supports a Finding of Detrimental Reliance
On cross-appeal, counsel for the Fund asserts that the circuit court erred in overruling its motion for judgment notwithstanding the verdict because the City did not make a' submissive case of fraud or negligent misrepresentation in that the City presented no evidence that it relied to its detriment on Mr. Vuchetich’s representations. In fraudulent misrepresentation cases, the plaintiff is required to establish each and every element of a fraud claim, and its failure to do so is fatal to the claim. Heberer v. Shell Oil Co., 744 S.W.2d 441, 443 (Mo.banc 1988). An injury directly and proximately caused by the misrepresentation is an essential element of a fraudulent misrepresentation claim. Hess v. Chase Manhattan Bank, USA, N.A., 220 S.W.3d 758, 765 (Mo.banc 2007).
Counsel for the Fund contends that the uncontroverted evidence shows that the City actually saved $30,000.00 by relying on Mr. Vuchetich’s statements and hiring Midwest Remediation. Counsel argues that the City provided no proof that hiring Midwest Remediation resulted in costs to the City beyond those that the City was to incur, if it did not hire Midwest Remediation. This argument, however, ignores that the City presented evidence that it would have acted differently if Mr. Vuchetich had not promised that the cost of Midwest Remediation’s work would be paid from the Fund.
Ms. Wright testified that, based on Mr. Vuchetich’s representations, the City left the April 2004 meeting with the understanding that the Fund’s representatives wanted the City to hire Midwest Restoration and that the City would be reimbursed from the Fund for the costs of Midwest Remediation’s work, less the amount that the City would have otherwise paid Rose-Lan for the same portion of the sewer project. As a result, the City authorized Rose-Lan to subcontract with, Midwest Restoration for that portion of the sewer project. The City then paid Midwest Restoration for its work on the sewer project. Ultimately, however, the City was not reimbursed from the Fund for- the costs .of Midwest Remediation’s work. Ms. Wright testified that, if shé would have been told that the .City would not be reimbursed from the Fund for all of the costs in excess *750 of Rose-Lan’s contract price, she would have told representatives of the Fund to “come and get your contaminated soil, and get it out of our easement, and completely remove it, dean it up, get a certification that it’s now clean.” Ms. Wright further testified that the City would then have had Rose-Lan complete the sewer installation as originally planned at no additional cost. Mr. Martin provided similar testimony. Testimony at trial reflected that the cost of excavation of all contaminated soils would have been approximately $500,000, for which the City claimed the Fund would have been responsible.
Based upon the proceeding facts, the City presented substantial evidence to' allow the trier of fact to find that' the City relied on Mr. Vuchetich’s representations to its detriment in that the City incurred additional costs when it hired and paid Midwest Restoration to complete that portion of the sewer project that it otherwise would not have incurred had the City demanded representatives of the Fund remove all contaminated soil for Rose-Lan to complete that portion of the sewer project as- initially planned. The circuit court, therefore, did not err in overruling the Fund’s motion for JNOV because the City presented sufficient evidence to support its fraudulent misrepresentation claim.[5]
VI. The Punitive Damages Award against the Fund Was Erroneous
Counsel for the Fund further asserts that the circuit court erred in awarding punitive damages against the Fund.[6] More specifically, counsel asserts *751 that-section 819.131 provides no authority for the payment of punitive damages from the Fund.
The Fund is a statutorily created account. See section 319.129.1. Creatures of statute like the Fund can operate only in accordance with their enabling statutes. See State ex rel. MoGas Pipeline, LLC v. Missouri Pub. Serv. Comm’n, 366 S.W.3d 493, 496 (Mo.banc 2012).’ Section 319.131 speaks in terms of the Fund’s liability. It outlines two instances in which the Fund provides coverage: (1) the Fund will pay all of its participants’ cleanup “costs ... which are greater than ten thousand dollars but less than one million dollars per occurrence or two million dollars aggregate per year” and (2) the Fund “shall provide coverage for third-party claims involving property damage or bodily injury caused by leaking petroleum storage tanks whose owner or operator is participating in the fund at the time the release occurs or is discovered.” See section 319.131.4; section 319.131.5. There is no authority for payment from the Fund for claims beyond those expressly articulated in section 319.131. Therefore, pursuant to its enabling statutes, the Fund is to be used for payment of 'its participants’ cleanup costs and third-parties’ claims involving property damage or bodily injury.
Here, the City’s claims against the Fund did not fall within the statutorily authorized claims set out in section 319.131, Instead, the City sought and was awarded compensatory and punitive damages against the' Fund for fraudulent and negligent misrepresentation made by representatives of the Fund. • Under section 319.131, the Fund is not authorized to provide coverage for such claims as they do hot constitute participants’ cleanup costs or involve third-party claims for property damage or bodily injury. The tort claims alleged by the City, therefore, are beyond the coverage articulated in the Fund’s enabling statutes. It follows, therefore, that the City’s claims are not cognizable under section 319.131. MoGas Pipeline, 366 S.W.3d at 496.
*752 Moreover, the statutory structure of the Fund is such that it cannot be liable for its own conduct. The City named the Fund as the defendant, but the Fund is merely an account within the state’s treasury. Specifically, section 319.129.4 provides that the Board of Trustees is responsible for the “general administration of the fund” and the “proper operation of the fund, including all decisions relating to payments from the fund.” Because the Fund is merely an account within the state treasury, “it” cannot provide coverage, pay claims, or take any other action. Instead, some person or entity must be authorized to do these things using the Fund. Accordingly, section ,319.129.4 provides: “The general administration of the fund and the responsibility for the proper operation of the fund, including all decisions relating to payments from the fund, are hereby vested in a board of trustees.” The Board is a state agency, designated “a type III agency,” and it has authority to “appoint an executive director and other employees as needed, who shall' be state employees[J” Section 319.129.8. The Board also “may select and employ, or may contract with, persons experienced in insurance underwriting, accounting, the servicing of claims and rate making, and legal counsel to defend third-party claims, who shall serve at the board’s pleasure.” Section 319.129.10.
Here, the City did not sue the Board or its members, employees, or contractors. Instead, it sued the Fund itself. There are no reported cases in which the Fund — as an entity — has sued or been sued. Instead, suits have been brought against the Board of Trustees, see, e.g., Chouteau Dev. Co., LLC v. Sinclair Mktg., Inc., 200 S.W.3d 68 (Mo.App.2006); Rees Oil Co. & Rees Petroleum Products v. Dir. of Revenue, 992 S.W.2d 354 (Mo.App.1999), or the chair of the Board in his or her official capacity, see, e.g., River Fleets, Inc. v. Creech, 36 S.W.3d 809 (Mo.App.2001); River Fleets, Inc. v. Carter, 990 S.W.2d 75 (Mo.App.1999).[7] Because enabling statutes for the Fund vest the Board of Trustees with the administration and the operation of the Fund, the Fund can do nothing to subject itself to the liability alleged by the City.
But even though counsel for the Fund initially moved to dismiss the City’s claims on the very grounds that result in this Court vacating the award of punitive damages now, the Fund’s counsel abandoned this argument on appeal with respect to the award of compensatory damages and seeks relief only from the award of punitive damages. Perhaps counsel for the Fund believed that the issue of compensatory damages was moot because, whether it paid “its own” compensatory damages judgment or paid the' third-party claim against McCall, the cost to the Fund would be the same. Whatever the reason, however, the Fund does not seek relief on appeal in this Court from the judgment against it for compensatory damages, and this Court should not grant relief that is not sought.
Consequently, this Court does not disturb the compensatory award against the Fund. Nevertheless, because the City did not have had a cognizable claim against the Fund for actual or compensatory damages, it could not recover punitive damages from the Fund. See Ellison v. Fry, 437 S.W.3d 762, 777 (Mo.banc 2014). Accord *753 ingly, the punitive damages judgment against the Fund is reversed. By reversing the punitive damages award, however, an issue of fairness and justice arises because counsel for the Fund failed to- raise the argument that the Fund’s trustees — not the Fund itself — are the proper parties until after the jury rendered its verdict. This means that, when. the issue finally was raised, the City was not in a position to request leave to amend its petition to add or substitute parties. Yet, the allegations in the City’s petition may state a cause of action against the Fund’s Board of Trustees for the actions of its agents. Without expressing any opinion about the merits of the claims that may be asserted or.the source for payment of any judgment against the Board on such claim, the furtherance of justice and fairness require that the cause be remanded to the circuit court. See East v. McMenamy, 266 S.W.2d 728, 732 (Mo.1954) (“The furtherance of justice requires that'a case should not be reversed without remanding unless the appellate court is convinced that the facts are such that a recovery cannot be ha'd[.]”).[8]
VII. Conclusion
The-judgment against McCall and Fleming is affirmed. The City, however, was not entitled to recover punitive damages from the Fund. Accordingly, the judgment is reversed with respect to the punitive damages awarded- against the Fund. Nevertheless, this Court affirms the award mf compensatory damages against the Fund because counsel for the Fund did not challenge the compensatory damages award on appeal. Additionally, because counsel for the Fund failed to raise the argument that the Fund’s trustees — not the Fund itself — are the proper parties until after the jury rendered its verdict and because the allegations in the City’s petition may state a cause of action against the Fund’s Board of Trustees for the actions of its agents, the cause is remanded in the interest of justice and fairness. The circuit court’s judgment is affirmed in all other respects.
Bf eckenridge, C.J., Stith, Draper and Russell, JJ., concur; Wilson, J., concurs in part in separate opinion filed; Fischer, J., concurs in part and dissents in part in separate opinion filed; Teitelman, J., concurs in part and dissents in part in. separate opinion filed.

. This opinion includes portions of the opinion of the court of appeals without further attribution.

. Unless otherwise noted, all statutory citations are to RSMo Supp. 2013.

. In its petition, the City alleged a count of negligence against McCall and Fleming. The City dismissed the negligence count at trial.

, McCall and Fleming did not file substitute briefs with this Court. The City and the Fund filed substitute briefs after this Court granted transfer. Pursuant to Rule 83.08(b), any mate *746 rial "included in the court of appeals brief that is not included in the substitute brief is abandoned.” Therefore, any material, including arguments, that the City or the Fund did not include in their respective substitute briefs is abandoned.

. As discussed below, the City’s claim, if any, was against the Fund’s Board of Trustees for the misrepresentations of its agents.

. The claim of error raised in the second point relied on by counsel for the Fund is that the circuit court erred in submitting the punitive damages claim to the jury because section 319.131 governs payments from the Fund and authorizes payments only for participants’ cleanup costs and third-parties’ claims involving property damage or bodily injury and expressly precludes payment from the Fund of punitive damages. The separate opinions of Judge Fischer and Judge Teitelman • would hold that counsel for the Fund failed to properly preserve this issue for appellate review by not raising the issue in a motion for a directed verdict or a motion for a JNOV, The separate opinions of Judge Fischer and Judge Teitelman raise tírese presérvation issues sua sponte. None of the parties-has questioned the preservation of .this issue on appeal, and even the court of appeals reviewed this issue on the merits.
It is not necessary to review the procedural history of the case to determine whether the claim of error in the second point was timely made and preserved because this claim of error, although not labeled as such by counsel for the Fund, is a claim that the City failed to state a cause of action against the Fund for . punitive damages. In other words, counsel for the Fund asserts that claims for cleanup costs and third-party property damage are the only cognizable claims authorized against the Fund and that any claims for payments beyond those authorized by statute are not cognizable against the Fund. .Prior to 2012, the rules of this Court permitted the defense of failure to state a claim to be raised for the first time on appeal. Rule 55.27(g)(2) (2011) ("A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under Rule 55.01, or by motion for judgment on the pleadings, or at the trial on the merits, or on appeal.") (emphasis added). During trial and at the time counsel for the Fund appealed from the circuit court’s judgment, the failure to state a claim still could be raised on appeal. See Barlett by and through Barlett v. Kansas City S. Ry. Co., 854 S.W.2d 396, 399 (Mo.banc 1993). Accordingly, the claim of error advanced,on appeal that the City’s claims against the Fund were not cognizable under section 319.131 is properly before this Court.
Moreover, contrary to the assertions made in the separate opinions of. Judge Fischer and Judge Teitelman, this issue is not one that needs to be raised in a motion for directed verdict to be preserved for appellate review. Even though Rule 72.01, which governs mo *751 tions for directed verdict and motions for JNOV, does not speak in terms of submissibility, a motion for directed verdict and a motion for judgment notwithstanding the verdict are legal terms of art with well-established meanings. A motion for directed verdict is defined as "[a] party’s request that the court enter judgment in its favor before submitting the case to the jury because there is no legally sufficient evidentiary foundation on which a reasonable jury could find for the other party.” Black's Law Dictionary 1170 (10th ed. 2014) (emphasis added). Likewise, a motion for JNOV is defined as "[a] party’s request that the court enter a judgment in its favor despite the jury's contrary verdict becausé there is no legally sufficient evidentiary basis for a jury to find for the other party.” Id. (emphasis added). Therefore, motions for directed verdict and motions for JNOV are intended to address whether there is a sufficient evidentiary basis- to support a verdict, i.e„ whether a submissiblq case has been made. This Court's jurisprudence provides that, in civil, jury-tried cases, it is necessary, "in order to preserve the question of submissibility for appellate review, to file a motion for directed verdict at the close of all evidence and to assign the error of the court in having failed to have directed such a verdict in an after-trial motion” such as a motion for a new trial or a motion for JNOV. Ukman v. Hoover Motor Express Co., 269 S.W.2d 35, 36 (Mo.1954) (emphasis added); see also Millar v. Berg, 316 S.W.2d 499, 502 (Mo.banc 1958). Questions of submissibility raised in a motion for JNOV, therefore, must have been raised in a motion for directed verdict to be preserved for appellate review. See Sanders v. Ahmed, 364 S.W.3d 195, 207 (Mo.banc 2012); Howard, 332 S.W.3d at 790; see also Grippe v. Momtazee, 696 S.W.2d 797, 798 (Mo.banc 1985). Because counsel for the Fund is not asserting that the City failed to- make a sub-missible case, as to punitive damages, the issue did not need to be raised in a motion-for directed verdict to be preserved for this Court’s review.

. By the same token, suits seeking to recover damages from the Second Injury Fund are not brought against the fund itself. Instead, they are brought against'the state treasurer, who is charged by section 287.220 with responsibility as custodian of the fund for issuing warrants for payment of covered claims as defined by applicable statutes. See, e.g., Treasurer of State-Custodian of Second Injury Fund v. Witte, 414 S.W.3d 455 (Mo.banc 2013); Pierson v. Treasurer of State, 126 S.W.3d 386 (Mo.banc 2004).

. Counsel for the Fund raises two other points, and the City raises three points on appeal regarding the punitive damages awarded against the Fund. This Court need not address those points because the Court’s opinion is dispositive of all issues raised regarding the Fund's liability for punitive damages.