

# In the
# Missouri Court of Appeals
## Western District

BRENDA ESTES, AS GUARDIAN    )
AND NEXT FRIEND FOR JANE DOE,    )
         )    **WD83764**
        **Appellant,**    )
         )    **OPINION FILED: March 16, 2021**
**v.**          )
         )
**THE BOARD OF TRUSTEES OF THE**    )
**MISSOURI PUBLIC ENTITY RISK**    )
**MANAGEMENT FUND IN THEIR**    )
**OFFICIAL CAPACITIES, ET AL.,**    )
         )
        **Respondents.**    )

**Appeal from the Circuit Court of Buchanan County, Missouri**
The Honorable Kate H. Schaefer, Judge

Before Division Four: Cynthia L. Martin, Chief Judge, Presiding, Lisa White Hardwick, Judge and Mark D. Pfeiffer, Judge

This case involves several issues of first impression relating to whether the Missouri Public Entity Risk Management Fund ("MOPERM") and its board of trustees can be sued in tort. Brenda Estes ("Estes"), as next friend for Jane Doe ("Doe"), appeals from the trial court's grant of summary judgment in favor of MOPERM and the individual members of its board of trustees in their official capacities. The trial court

found that MOPERM has sovereign immunity from claims of bad faith failure to settle within policy limits and breach of fiduciary duty asserted by Estes following an assignment of rights from MOPERM's insured, Alberta Hughes ("Hughes"). Because MOPERM does not have sovereign immunity, and because no other basis in the record supports the grant of summary judgment as a matter of law, we reverse the trial court's grant of summary judgment and remand this matter for further proceedings consistent with this opinion.

## Factual and Procedural Background[1]

Doe is a developmentally disabled woman who requires daily caretaking services. At all times relevant to this case, Doe was receiving services from Progressive Community Services ("PCS"), and specifically from PCS's employee, Hughes. PCS was organized under sections 205.968 through 205.973.[2]

MOPERM is a body corporate and politic created by the General Assembly.[3] It is authorized to provide insurance coverage to "public entities" as that term is defined in section 537.700.2(3). As a "public entity" under section 537.700.2(3), PCS elected to obtain insurance coverage from MOPERM, and was issued a memorandum of coverage for the period from January 1, 2012 to January 1, 2013. The memorandum of coverage

---

[1]When reviewing the grant of a motion for summary judgment, "[w]e view the record in the light most favorable to the party against whom the judgment was entered and accord the non-movant all reasonable inferences from the record." *Traweek v. Smith*, 607 S.W.3d 779, 784 (Mo. App. W.D. 2020). Here, the factual and procedural background is drawn from uncontroverted facts identified in the parties' summary judgment pleadings, and from the procedural history of the case found in court records.

[2]All statutory references are to RSMo 2016, as supplemented, except as otherwise noted.

[3]*See* section 537.700 *et. seq.*

also provided coverage to PCS's officers and employees as authorized by statute.[4] Section 537.705.1(2).

In November 2013, Estes, as legal guardian and next friend for Doe, brought a negligence action against Hughes after Hughes's husband raped and impregnated Doe while under Hughes's care ("Underlying Lawsuit"). MOPERM accepted Hughes's defense in the Underlying Lawsuit, subject only to a reservation of rights for any obligation to cover an award of punitive damages.

MOPERM's board of trustees possessed the exclusive right and sole authority to negotiate the settlement of Estes's claims against Hughes in the Underlying Lawsuit. Section 537.705.3. Efforts to settle the Underlying Lawsuit before trial were unsuccessful. The maximum amount MOPERM is permitted to pay for the payment and settlement of claims arising out of a single occurrence is $2,000,000, subject to indexed adjustments. Sections 537.756.1 and .2. Estes purportedly offered to settle her claims against Hughes in exchange for payment at or below this statutory limit. Before trial, MOPERM's board of trustees never offered more than $150,000 to settle Estes's claims against Hughes.

The Underlying Lawsuit proceeded to trial. A jury entered a verdict in favor of Estes and against Hughes on June 4, 2015, in the amount of $3,000,000 in compensatory damages (which was reduced by 30 percent for fault allocated to Doe's grandmother), and

---

[4]The extent of coverage obtained by PCS for its officers and employees as described in PCS's memorandum of coverage is not an issue in this appeal.

3

$6,000,000 in punitive damages. The trial court entered judgment accordingly in the Underlying Lawsuit on June 30, 2015.

Hughes appealed. On December 20, 2016, the trial court's judgment in the Underlying Lawsuit was affirmed by this Court. *Doe by and through Doe v. Hughes*, WD 79064, 2016 WL 7364704 (Mo. App. W.D. Dec. 20, 2016). Hughes's application for transfer to the Missouri Supreme Court was granted on April 4, 2017. *Doe by and through Doe v. Hughes*, SC96211.[5] When the Supreme Court granted transfer, at the request of the parties, it also entered an order staying the proceedings and remanding the matter back to the trial court to enable settlement negotiations.

On March 30, 2017, and thus just prior to the grant of transfer by the Supreme Court, Hughes assigned to Estes, as next friend for Doe, all of Hughes's rights, actions, and causes of action against MOPERM and its board of trustees arising out of the handling of the claims asserted in the Underlying Lawsuit.

On May 15, 2017, by agreement of the parties, the trial court in the Underlying Lawsuit entered an amended judgment vacating the jury's verdict and the trial court's original judgment dated June 30, 2015. The amended judgment entered judgment in favor of Estes and against Hughes in the amount of $8,000,000 in compensatory damages, with no fault apportioned to Doe's grandmother. The amended judgment also awarded Estes pre-judgment interest and post-judgment interest. MOPERM and the

---

[5]When the Missouri Supreme Court accepted transfer, our opinion in *Doe by and through Doe v. Hughes*, WD 79064, 2016 WL 7364704 (Mo. App. W.D. Dec. 20, 2016) was automatically vacated and has no precedential effect. *Stickler v. Ashcroft*, 539 S.W.3d 702, 713 n.9 (Mo. App. W.D. 2017) (citing *Bolden v. State*, 423 S.W.3d 803, 808 n.6 (Mo. App. E.D. 2013) (holding that following Supreme Court's grant of transfer, Court of Appeal's decision "'may be referred to as *functus officio*,' meaning 'without further authority or legal competence[.]'") (citation omitted)).

board of trustees' answer to the first amended petition filed by Estes in the instant case affirmatively states in paragraph 25 that the amended judgment in the Underlying Lawsuit "was entered with the consent of MOPERM," and that "MOPERM consented to the assignment" of Hughes's rights and claims against MOPERM to Estes, as next friend for Doe. On June 5, 2017, the appeal pending in the Missouri Supreme Court, but stayed by the Court's order, was voluntarily dismissed. *Doe by and through Doe v. Hughes*, SC96211.

After entry of the amended judgment in the Underlying Lawsuit, MOPERM paid Estes, as next friend for Doe, $2,000,000 in partial satisfaction of the judgment entered against Hughes.

On May 9, 2018, Estes, as next friend for Doe, and based on the assignment of rights and claims received from Hughes, filed suit in the Circuit Court of Buchanan County, Missouri against MOPERM and the individual members of MOPERM's board of trustees in their official capacities. Estes's first amended petition alleged a claim of bad faith failure to settle within policy limits and a claim of breach of fiduciary duty arising out of MOPERM's handling of the claims asserted against Hughes in the Underlying Lawsuit.

MOPERM and the board of trustees filed a motion for summary judgment. MOPERM and the board of trustees asserted that the uncontroverted material facts established, as a matter of law, that Estes's claims were barred by sovereign immunity; that Estes's bad faith failure to settle claim was precluded because MOPERM does not owe a duty of good faith to its insureds as it is not a liability insurer and merely

5

administers a self-insurance pool; and that Estes's claims were precluded because MOPERM's enabling legislation prohibits the use of MOPERM funds to pay such claims, and prohibits MOPERM from paying in excess of $2,000,000 for all claims arising out of a single occurrence.

On March 31, 2020, the trial court entered its final judgment and order ("Judgment") granting summary judgment in favor of MOPERM and its board of trustees. The Judgment concluded that "the Court finds no genuine issue of material fact and **SUSTAINS** the motion. The Court rules that MOPERM has sovereign immunity for all claims asserted in both counts of Plaintiff's First Amended Petition."

Estes appeals.

## Standard of Review

"We review the grant of summary judgment *de novo*." *In re Annaliese Brightwell Trust*, 605 S.W.3d 143, 145 (Mo. App. W.D. 2020). "Summary judgment shall be entered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Messina v. Shelter Ins. Co.*, 585 S.W.3d 839, 842 (Mo. App. W.D. 2019) (citation and quotation omitted). "The Court reviews the record in the light most favorable to the party against whom judgment was entered, and gives the non-movant the benefit of all reasonable inferences from the record." *Truman Med. Ctr., Inc. v. Progressive Cas. Ins. Co.*, 597 S.W.3d 362, 365-66 (Mo. App. W.D. 2020) (citation and quotation omitted). Here, Estes does not contend that controverted facts precluded the entry of summary judgment. Instead, Estes contends that based on the uncontroverted facts, summary judgment should not have been granted as a matter of law.

6

MOPERM and the board of trustees' motion for summary judgment urged four distinct bases for granting summary judgment in their favor. The trial court's Judgment expressly relied on only one urged basis--that sovereign immunity barred Estes's claims against MOPERM and its board of trustees in their official capacities. The trial court did not address the contention that MOPERM is not a liability insurer, and therefore owes no duty of good faith to its insureds to attempt to settle claims within policy limits. The trial court did not address the contention that MOPERM's funds cannot be used to pay claims of the nature asserted by Estes. And the trial court did not address the contention that MOPERM has paid all that it is statutorily permitted to pay for claims arising out of a single occurrence. However, we "will affirm the trial court's summary judgment on any ground supported by the record, whether relied on by the trial court or not." *Sisk v. Union Pac. R. Co.*, 138 S.W.3d 799, 809 (Mo. App. W.D. 2004) (quotation omitted); *see also Nowden v. Div. of Alcohol & Tobacco Control*, 552 S.W.3d 114, 116 (Mo. banc 2018) ("[T]he trial court's judgment may be affirmed on any basis supported by the record." (quotation omitted)).

## Analysis

Estes raises three points on appeal challenging the trial court's grant of summary judgment in favor of MOPERM and its board of trustees. The first and second points address the trial court's stated basis for granting summary judgment--sovereign immunity.[6] Specifically, in her first point, Estes asserts that the trial court committed

---

[6]Estes does not contest that if MOPERM enjoys sovereign immunity from Estes's claims of bad faith failure to settle and breach of fiduciary duty, that same protection extends to the individual members of the board of trustees who have been sued in their official capacities. "Sovereign immunity, if not waived, bars suits against

legal error in concluding that Estes's claims were barred by sovereign immunity because MOPERM is not a public entity entitled to sovereign immunity since it is not controlled by and directly answerable to public officials, public entities, or the public itself, and does not perform a service traditionally performed by the government. Estes's second point argues that the trial court committed legal error in concluding that Estes's claims were barred by sovereign immunity because MOPERM does not hold state funds and the state is not liable for MOPERM's obligations. Whether MOPERM has sovereign immunity from tort claims presents an issue of first impression in Missouri.

Estes's third point on appeal addresses the alternative bases for granting summary judgment raised in MOPERM and the board of trustees' motion for summary judgment, but not expressly relied on by the trial court in its Judgment. Estes asserts that the trial court's Judgment cannot be affirmed on any other basis supported by the record because MOPERM is a liability insurer with a duty to act in good faith with respect to the settlement of claims against its insureds, and because Estes's claims are neither prohibited by MOPERM's enabling legislation nor subject to the statutory limit on payment of all claims arising out of a single occurrence. Each of the alternative bases for summary judgment addressed in Estes's third point on appeal presents an issue of first impression in Missouri.

We address Estes's points on appeal in order. Our analysis is benefitted by first briefly explaining the purpose and function of MOPERM.

---

employees [named] in their official capacity, as such suits are essentially direct claims against the state." *Suppes v. Curators of Univ. of Mo.*, 613 S.W.3d 836, 855 (Mo. App. W.D. 2020) (citation omitted).

8

# I.

***MOPERM is a creature of statute, authorized to provide insurance coverage to public entities, their officers and employees***

"MOPERM is a public body corporate and politic,[7] created by the Missouri General Assembly in 1986 to provide liability coverage for insured risks to participating public entities and their officers and employees when engaged in their official duties[.]" *Gilley v. Mo. Pub. Entity Risk Mgmt. Fund*, 437 S.W.3d 315, 318 (Mo. App. W.D. 2014). *See* section 537.700.1; section 537.705.1. As used in sections 537.700 through 537.756, "public entity" means "any city, county, township, village, town, municipal corporation, school district, special purpose or taxing district, or any other local public body created by the general assembly." Section 537.700.2(3). The MOPERM enabling legislation affords these public entities the opportunity to acquire, at their election, the right of a defense to, and coverage for, claims that are not covered by the State Legal Expense Fund ("SLEF"). *Gilley*, 437 S.W.3d at 320 n.6 (citing *P.L.S. ex rel. Shelton v. Koster*, 360 S.W.3d 805, 814-17 (Mo. App. W.D. 2011) (observing that the SLEF is limited to coverage of the state, agencies of the state, and their officers and employees)); *see* section 105.711.2(1).

"The general administration of, and responsibility for, the proper operation of" MOPERM is managed through a board of trustees. Section 537.730.1. MOPERM's board of trustees "shall have the powers and duties specified in sections 537.700 to 537.755 and such other powers as may be necessary or proper to enable it, its officers,

---

[7]We discuss, *infra*, the import of the General Assembly's designation of MOPERM as a body corporate and politic.

employees and agents to carry out fully and effectively all the purposes of sections 537.700 to 537.755." Section 537.700.1.

"'MOPERM functions like a liability insurance carrier and issues to each insured a 'memorandum of coverage.'" *Gilley*, 437 S.W.3d at 320 n.6 (quoting *Mo. Pub. Entity Risk Mgmt. Fund v. Am. Cas. Co. of Reading*, 399 S.W.3d 68, 71 (Mo. App. W.D. 2013)). Absent a statutory provision to the contrary, MOPERMS's coverage obligations are controlled by the language in the memorandum of coverage. *Naucke v. Mo. Pub. Entity Risk Mgmt. Fund*, 95 S.W.3d 166, 168-69 (Mo. App. W.D. 2003).

MOPERM's board of trustees has the sole and exclusive power to "negotiate the settlement of and provide the defense of any claim for which coverage has been obtained by any public entity in accordance with coverages offered by the board." Section 537.705.3. MOPERM's enabling legislation provides that "[n]o amount in excess of the amount specified by section 537.756 shall be paid from the fund for the payment and settlement of claims arising out of any single occurrence." Section 537.705.2. Sections 537.756.1 and .2 limit this amount to $2,000,000, subject to indexed adjustments.[8]

Because MOPERM "is a body corporate and politic, [] the state of Missouri shall not be liable in any way with respect to claims made against the fund or against entities or individuals covered by the fund, nor with respect to any expense of operation of the fund." Section 537.705.4. "Money in the fund is not state money nor is it money collected or received by the state." *Id.*

---

[8]Section 537.730.8 does authorize MOPERM's board of trustee to procure insurance covering participating public entities, their officer and employees for amounts in excess of the statutory limit set forth in section 537.756. There is nothing in the record which suggests that excess coverage of this nature was obtained by PCS from MOPERM.

10

## II.

***Points One and Two: Because MOPERM is not a public entity for purposes of sovereign immunity protection under section 537.600.1, the trial court erred in concluding that Estes's claims against MOPERM were barred by sovereign immunity***

Estes's first point on appeal argues that the trial court committed legal error in granting summary judgment in favor of MOPERM and its board of trustees on the basis of sovereign immunity because MOPERM does not qualify as a public entity for purposes of sovereign immunity under section 537.600.1 as it is not controlled by and answerable to public officials, public entities, or the public itself, and as it does not perform a service traditionally performed by the government. Estes's second point on appeal argues that the trial court committed legal error in granting summary judgment in favor of MOPERM and its board of trustees on the basis of sovereign immunity because MOPERM does not hold state funds that are subject to sovereign immunity. We address these points collectively.

## A.

### *Public entities are entitled to sovereign immunity protection*

The Missouri Supreme Court "abolished sovereign immunity in *Jones v. State Highway Comm'n*, 557 S.W.2d 225 (Mo. banc 1977)." *Stacy v. Truman Med. Ctr.*, 836 S.W.2d 911, 917 (Mo. banc 1992) (*abrogated on unrelated grounds by Southers v. City of Farmington,* 263 S.W.3d 603, 614 n.13 (Mo. banc 2008)). "The legislature, however, restored sovereign immunity by enacting sections 537.600 through 537.650, RSMo 1986 and Supp. 1991." *Id.* Section 537.600.1 provides, in pertinent part:

11

Such sovereign immunity or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect; except that, the immunity of the *public entity* from liability and suit for compensatory damages for negligent acts or omissions is hereby expressly waived in the following instances: . . . .[9]

(Emphasis added.)

"Section 537.600 introduced the phrase 'public entity' without defining it." *Stacy*, 836 S.W.2d at 917. In 1989, the General Assembly partially defined "public entity" by amendment to section 537.600 to provide that "'public entity' as used in this section shall include any multistate compact agency" formed between Missouri and another state and approved by the Congress of the United States. Section 537.600.3 RSMo 1986. However, no further guidance is provided in sections 537.600 through 537.650 about the meaning of the term "public entity" beyond the directive that "governmental tort immunity as existed at common law in this state prior to September 12, 1977 . . . shall remain in force and effect." Section 537.600.1.

In *Stacy*, our Supreme Court acknowledged the absence of a statutory definition for "public entity" in sections 537.600 through 537.650, and provided guidance about determining the reach of the term:

Section 537.600.3 contains a partial definition related to a multi-state compact agency not relevant to the present discussion. The fact that the legislature partially defined the term 'public entity' in 1989, however, signifies that this term is intended to encompass the entities that will be protected under the statute. In turn, based upon the legislative history, this

---

[9]The statutory exceptions to sovereign immunity described in section 537.600.1 are for "injuries resulting from a public employees' operation of a motor vehicle in the course of their employment, or injuries caused by the condition of a public entity's property." *State ex rel. Blue Springs School Dist. v. Grate*, 576 S.W.3d 262, 268 (Mo. App. W.D. 2019) (internal citation and footnote omitted). Those exceptions are not at issue in this appeal.

12

statute protects 'public entities' that were protected under the sovereign immunity cases prior to September 12, 1977.

Section 537.700.2(3) specifically defines 'public entity' for purposes of sections 537.700 to 537.755 related to risk management for public entities. Section 537.745.1 provides that the liability of public entities under sections 537.700 to 537.755 shall be the same as the liability of public entities under the sovereign immunity statute. Thus, the definition of 'public entity' in section 537.700.2(3) may be helpful in deciding the scope of 'public entities' under section 537.600. Section 537.700.2(3) provides as follows:

[T]he following words and terms . . . mean:

* * * * * *

(3) '**Public entity**', any city, county, township, village, town, municipal corporation, school district, special purpose or taxing district, or any other local public body created by the general assembly.

836 S.W.2d at 917 (citations omitted). *Stacy* thus held that although sections 537.600 to section 537.650 do not identify all of the "public entities" entitled to sovereign immunity, at a minimum, the term includes the "public entities" defined in section 537.700.2(3) who are eligible to obtain coverage from MOPERM. *Id.*

*Stacy* inherently recognized, however, that the definition of "public entity" in section 537.700.2(3) used to determine MOPERM eligibility is not exhaustive for purposes of determining sovereign immunity eligibility,[10] and that entities which do not fall within the MOPERM definition may nonetheless possess attributes sufficient to

---

[10]That is obviously the case as the state and agencies of the state enjoy sovereign immunity, and are thus "public entities" for purposes of section 537.600.1, even though the state and agencies of the state do not fall within the definition of "public entity" set forth at section 537.700.2(3). *See Metro. St. Louis Sewer Dist. v. City of Bellefontaine Neighbors*, 476 S.W.3d 913, 921 (Mo. banc 2016) (observing that '[t]he rule is that the state, by reason of its sovereign immunity, is immune from suit and cannot be sued in its own courts without its consent. . ." (quotation omitted)); *see P.L.S. ex rel. Shelton*, 360 S.W.3d at 819 (distinguishing the state and agencies of the state for sovereign immunity and the SLEF purposes from public entities as defined in MOPERM's enabling legislation).

13

warrant extending sovereign immunity protection because it can be concluded the entity would have enjoyed such protection prior to September 12, 1977. *Id.* The Supreme Court in *Stacy* was asked to determine whether Truman Medical Center ("TMC"), a private, not-for-profit hospital, was a "public entity" for purposes of section 537.600.1 sovereign immunity protection. *Id.* The Court framed the issue accordingly:

> Because TMC is not any of the specific entities listed in section 537.700.2(3), but is a private, not-for-profit corporation pursuant to chapter 355, TMC is not a defined 'public entity' for purposes of sovereign immunity. However, because the case law has treated some hybrid entities, which are not expressly included in the above definition, [as subject to sovereign immunity] the issue remains ***whether as a hybrid entity it is enough like a public entity that it is entitled to sovereign immunity under section 537.600.***

*Id.* (emphasis added) (citations omitted).

To settle upon the criteria for determining if a hybrid entity is entitled to sovereign immunity protection, *Stacy* examined three earlier cases where a hybrid entity was deemed to be a public entity for purposes of section 537.600.1. *Id.* at 918 (citing *State ex rel. Reg'l Justice Info. Serv. Comm'n v. Saitz*, 798 S.W.2d 705, 706 (Mo. banc 1990) ("*REJIS*") (involving a joint commission created by the City of St. Louis and St. Louis County to operate a regional criminal justice database); *State ex rel. Trimble v. Ryan*, 745 S.W.2d 672, 674 (Mo. banc 1988) (involving the Bi-State Development Agency formed by interstate compact between Missouri and Illinois in 1949 to address metropolitan transportation issues and needs); *State ex rel. Cass Med. Ctr. v. Mason*, 796 S.W.2d 621, 621 (Mo. banc 1990) (involving a county owned hospital)). After reviewing these cases,

14

*Stacy* identified "three features common among the entities," and designated the three features as "requirements for sovereign immunity." *Id*. at 919.

"First, each entity must perform a service traditionally performed by the government, *i.e*., the provision of a criminal justice database as in *REJIS*, metropolitan transportation as in *Trimble*, and medical care as in *Cass Medical Center*." *Id*. "The second, and probably the most critical, requirement of entities entitled to sovereign immunity is that they are controlled by and directly answerable to one or more public officials, public entities, or the public itself." *Id*. "The third requirement concerns what limitations, if any, apply to the creation of a public entity that will have the benefits of sovereign immunity. Put another way, the basic issue involves how and by whom is government or a public entity formed?" *Id*.

**B.**

### *Whether MOPERM is enough like a public entity to warrant sovereign immunity protection*

MOPERM concedes that it is not one of the specific entities listed in section 537.700.2(3)'s definition of "public entity." That is not unexpected since the definition of "public entity" in section 537.700.2(3) is intended to identify the entities eligible to obtain coverage *from* MOPERM. And although MOPERM is a legislatively formed entity that operates statewide, MOPERM does not contend that it enjoys sovereign immunity because it is the state or an agency of the state. Nor could it, as section

15

537.705.4 expressly provides that MOPERM is not "the state."[11] Thus, MOPERM can only establish that it is entitled to sovereign immunity if it is a hybrid entity that is "enough like a public entity that it is entitled to sovereign immunity under section 537.600." *Stacy*, 836 S.W.2d at 917. To achieve this standard, MOPERM must satisfy the three requirements announced in *Stacy*. *Id.* at 919.

### i. MOPERM satisfies the third *Stacy* requirement as it was formed by the government

Estes's first point on appeal challenges only whether MOPERM satisfies the first and second *Stacy* requirements. Estes does not contest that MOPERM satisfies the third *Stacy* requirement. In fact, MOPERM was formed by the General Assembly as a body corporate and politic and thus satisfies the third *Stacy* requirement. *See* section 537.700.1. "New governmental entities or political subdivisions of existing governmental entities are formed by government itself or by the voters acting as a group." *Stacy*, 836 S.W.2d at 919.

Though MOPERM satisfies the third *Stacy* requirement, that is not sufficient, standing alone, to support the conclusion that MOPERM is a "public entity" pursuant to section 537.600.1. *See Trimble*, 745 S.W.2d at 674 (discussing how Bi-State's commissioners are appointed and whether Bi-State's authority aligned with "substantial governmental authority and power" to determine whether Bi-State was entitled to

[11]The implication on sovereign immunity of enabling legislation creating an entity or fund that includes a provision declaring that the entity or fund is not the state or possessed of state moneys is discussed in greater detail, *infra*. In connection with that discussion, we observe in footnote 20, *infra*, that the application of the *Stacy* hybrid entity requirements to entities like MOPERM that are authorized by enabling legislation, but that are plainly not local or regional entities, is potentially suspect. However, both parties in this case believe the *Stacy* requirements are controlling in determining whether MOPERM has sovereign immunity, influenced, no doubt, by the fact that *Stacy* neither holds, nor hints, that only local or regional entities can be "hybrid entities" whose eligibility for sovereign immunity depends on satisfying the *Stacy* requirements. 836 S.W.2d at 919.

16

sovereign immunity, though Bi-State was a body corporate and politic); *Reg'l Justice Info. Serv. Comm'n*, 798 S.W.2d at 707-08 (discussing numerous factors to determine if REJIS enjoyed sovereign immunity, though REJIS was a body corporate and politic). Thus, Estes's concession that MOPERM satisfies the third *Stacy* requirement because it is an entity formed by government is not dispositive, as all three *Stacy* requirements must be established. *Stacy*, 836 S.W.2d at 919.

### ii. MOPERM does not satisfy the first *Stacy* requirement because it does not perform a service traditionally performed by government

We next address whether MOPERM "perform[s] a service traditionally performed by the government." *Stacy*, 836 S.W.2d at 919. The Supreme Court clarified the focus of this requirement as follows:

> We have avoided characterizing this requirement as calling for a governmental function; such terminology would confuse this requirement with the distinction between the two types of functions performed by municipalities and school districts, e.g., governmental versus proprietary. In fact, this requirement is much broader because *we are asking whether this entity does what government has typically done in the past*; because government performs both governmental and proprietary functions, activities fitting within either of those categories should satisfy this requirement. In view of the broad range of activities in which the government is involved, it is difficult to envision a hybrid entity that meets the other requirements but would not meet this one.

*Id*. (emphasis added). MOPERM has not referred us to any situation where our state government has historically performed the service of providing optional liability insurance coverage to public entities, their officers and employees, in exchange for the payment of annual contributions that are tantamount to premiums. We are aware of no such service ever having been undertaken by our state government prior to September 12,

17

1977, the temporal benchmark before which sovereign immunity as existed at common law in this state is to remain in full force and effect. Section 537.600.1.

MOPERM does point to a different "insuring" function undertaken by our state government beginning in 1967 through the "Tort Defense Fund." Section 105.710 RSMo 1967. By 1975, section 105.710 provided that "[a]s part of the compensation to be paid" to various officers and employees of designated state agencies, "the commissioner of administration is authorized to pay from the 'Tort Defense Fund,' which is hereby created," final judgments against said persons "arising out of and performed in connection with their official duties in behalf of the state."[12] Section 105.710 RSMo Cum. Supp. 1975. In 1983, the Tort Defense Fund was replaced when the General Assembly enacted sections 105.711 through 105.726 to create the SLEF. *Betts-Lucas v. Hartmann*, 87 S.W.3d 310, 319 (Mo. App. W.D. 2002). Similar to the Tort Defense Fund, the SLEF "consists of sums appropriated by the General Assembly and any funds otherwise credited to the Fund by certain departments pursuant to section 105.716." *P.L.S. ex rel. Shelton*, 360 S.W.3d at 809. And similar to the Tort Defense Fund, the SLEF is available for:

> [T]he payment of any claim, or any amount required by any final judgment against (1) the State, or any agency of the State (to the extent that the claim against the State is authorized pursuant to section 537.600, the sovereign immunity statute); and (2) against 'any officer or employee of the State or any agency of the State,' as provided and as limited in the statute.

---

[12]When section 105.710 was originally enacted, it did not create a "Tort Defense Fund" funded by state appropriations, but instead authorized the Commissioner of Administration to acquire private liability insurance to cover those designated in the statute, with the cost of premiums chargeable to each state agencies budget. Section 105.710 RSMo. 1967. Section 105.710 was amended, however, in 1969 to move away from authorizing the acquisition of private liability insurance to the creation of the "Tort Defense Fund." Section 105.710 RSMo 1969.

*Id.*

MOPERM argues that the SLEF, and the Tort Defense Fund it replaced, require us to conclude that MOPERM is performing a traditional governmental service. It is true that "[t]he MOPERM Fund was created by the legislature to function (in part) in a fashion similar to that of the [SLEF.]" *Id.* at 813. And it is true that MOPERM and the SLEF are both authorized to provide legal protection to certain governmental entities, and their officials and employees. *See id.* at 814 ("The first thought coming to mind is that the MOPERM statute was designed to provide a mechanism for the defense of the various local government employees who were excluded from the scope of the [SLEF]."). Thus, like MOPERM, the SLEF is a "mechanism to settle and pay 'claims' against . . . individual employees" and "sounds like insurance." *Dixon v. Holden*, 923 S.W.2d 370, 378 (Mo. App. W.D. 1996).

However, unlike MOPERM, the SLEF is not a body corporate and politic, and is merely an appropriation of state funds which the Attorney General is authorized to use to defend and cover claims against the state, agencies of the state, and their officers and employees acting in their official capacity. Section 105.711.1; section 105.711.2(1)-(2). In other words, the SLEF is a designated appropriation of state funds used to defend and cover claims that impact the state's interests. Section 105.711.2(1)-(2). This function "seem[s] to flow from one policy--to promote governmental efficiency and protect *state* business by protecting employees." *Dixon*, 923 S.W.2d at 381 (emphasis added). "The fundamental purpose of the SLEF is to protect the covered employees from the burden and expense of civil litigation relating to the performance of their duties. The purposes

are apparent. A competent employee, who is in demand elsewhere, may be unwilling to work for the state without protection. Those who do serve may be unwilling to take necessary risks for fear of litigation." *Laughlin v. Perry*, 604 S.W.3d 621, 632 (Mo. banc 2020) (quotation omitted)). MOPERM does not serve this same function. MOPERM is a legal entity that is distinct from those it insures, and "a public entity must pay for the right to participate in MOPERM, and such participation is optional." *Gilley*, 437 S.W.3d at 320 n.6 (citing section 537.705.1). Because public entities entitled to obtain coverage from MOPERM are not the state or state agencies, MOPERM's provision of a defense and coverage to participating public entities does not serve the function of protecting state business or state funds. *See P.L.S. ex rel. Shelton*, 360 S.W.3d at 818-19 (distinguishing public entities eligible for MOPERM coverage "for which right they must pay" from the "free coverage funded by the General Assembly's appropriations" provided to the state, agencies of the state, and their officers and employees); *cf.* section 537.705.4 (providing that MOPERM funds are not state money, and that the state is not liable for claims against MOPERM, or against any public entity, officers or employees covered by MOPERM).

Even if we ignore this fundamental difference in purpose, it is highly persuasive that our courts have ***not*** characterized the entirety of the service provided by the SLEF as a "traditional governmental service." In *Dixon*, the State Treasurer and the Commissioner of Administration argued that a suit against the SLEF to recover a judgment entered against a state employee violated the state's sovereign immunity protection. 923 S.W.2d at 378. *Dixon* disagreed, and concluded that the SLEF's defense

20

and coverage of state officers and employees "is merely a voluntary assumption of defense and payment of judgments or claims against state employees sued for their conduct arising out of and performed in connection with official duties on behalf of the state. *Id.* at 379. As such "[t]he doctrine of sovereign immunity is not an issue. . . ." *Id.* That is because sovereign immunity does not extend to the officers or employees of entities entitled to sovereign immunity protection. *Cottey v. Schmitter*, 24 S.W.3d 126, 129 (Mo. App. W.D. 2000) (holding that "[w]hile the state enjoyed the limitation on liability under the sovereign immunity provisions, [the state's employee sued by an injured party] did not"). Thus, a claim to recover a judgment entered against a state officer or employee from the SLEF "[does] not violate the doctrine of sovereign immunity." *Id.*; *see also Betts-Lucas*, 87 S.W.3d at 327-28 ("'The doctrine of sovereign immunity is not an issue' in a claim by a plaintiff seeking recovery from the [SLEF]." (quoting *Dixon*, 923 S.W.2d at 379)); *State ex rel. Cravens v. Nixon*, 234 S.W.3d 442, 449 (Mo. App. W.D. 2007) (holding that sovereign immunity is not available as a defense to claims to recover from the SLEF where the underlying litigation is against state employees and not the state itself).

We recognize that the aforesaid SLEF sovereign immunity cases were not addressing the *Stacy* requirements for determining when a hybrid entity is a "public entity" for purposes of section 537.600.1. That is readily explained, however, by the fact that the SLEF is not an entity, and is instead a mere appropriation of funds managed by the Commissioner of Administration and the Attorney General. Section 105.711.1; section 105.711.5. However, the relevance of the aforesaid SLEF cases to the first *Stacy*

21

requirement when applied to MOPERM cannot be ignored. The cases confirm that the state's decision to provide a defense and coverage to state officers and employees is not a "traditional governmental service," and is instead a voluntarily assumed duty that is *not* subject to sovereign immunity protection. If the provision of coverage to state and state agency officers and employees by the SLEF is not a traditional government service entitling the SLEF to sovereign immunity, then the comparable provision of coverage to officers and employees of participating public entities by MOPERM is not a traditional governmental service.

Undeterred, MOPERM argues that the first *Stacy* requirement is no longer relevant because it was abandoned in *Casualty Reciprocal Exchange v. Missouri Employers Mutual Insurance Company*, 956 S.W.2d 249 (Mo. banc 1997). We disagree. *Casualty Reciprocal Exchange* did not address whether an entity was entitled to sovereign immunity protection, and instead addressed whether a corporation was a "public corporation" such that its formation did not violate Article XI, section 2 of the Missouri Constitution, prohibiting the creation of corporations by special law. 956 S.W.2d at 254. To address that narrow issue, the Supreme Court drew analogously upon the *Stacy* public entity requirements, though it discounted the relevance of *Stacy's* "traditional governmental service" requirement for purposes of the issue it was required to resolve:

> *In the instant case*, [the three *Stacy* factors] are useful for identifying a public entity/corporation with the exception of the [service traditionally performed by government] element. As this Court noted in *Stacy*, the manner in which government traditionally acted is of limited importance in identifying a public entity/corporation in modern times because of the 'broad range of activities in which the government is involved....' [] Moreover, *what is important in this context* is whether a corporation is

22

> *'established and controlled by the state for public purposes,'* not whether the protection historically afforded the sovereign should apply to a government's current activities. [] Consequently, there is no reason *in this case* for an independent requirement that a public corporation perform actions that government has traditionally performed in the past. The more important requirement is that the corporation be created and controlled for a public purpose.

*Id.* (emphasis added) (citations omitted). This holding explains that *Casualty Reciprocal Exchange* did not abandon the first *Stacy* requirement, but simply deemed the requirement irrelevant to the question the Court was being asked to resolve. Confirmation of this conclusion is found immediately preceding the above referenced passage, where *Casualty Reciprocal Exchange* unequivocally observed that "[a] public entity/corporation that possesses *all three* of the [*Stacy* requirements] is a public corporation *for purposes of sovereign immunity*." *Id.* (emphasis added). *Casualty Reciprocal Exchange* cannot be read as MOPERM suggests to have abrogated the first *Stacy* requirement when determining whether a hybrid entity is a "public entity" for purposes of section 537.600.1 sovereign immunity protection.

*Casualty Reciprocal Exchange's* need to discount the value of the first *Stacy* requirement is nonetheless relevant here, as it permits the reasoned implication that the corporation in that case did not readily satisfy the requirement of performing a traditional governmental service. 956 S.W.2d at 254. The corporation at issue in *Casualty Reciprocal Exchange* was Missouri Employers Mutual ("MEM"). *Id.* at 252. MEM and MOPERM are strikingly similar in their origin and purpose.

In 1993, the General Assembly enacted the legislation that created MEM as an "independent public corporation." Section 287.902. "The stated purpose of MEM is to

23

insure Missouri employers against liability for workers' compensation, occupational disease, and employers' liability coverage." *Cas. Reciprocal Exch.*, 956 S.W.2d at 252 (citing section 287.902). Similar to MOPERM, MEM is a government authorized provider of insurance, though MEM can extend workers' compensation coverage to all employers, including private employers, where MOPERM can only extend liability to public entities as defined, their officers and employees. *See* section 287.902; section 537.705.1. Similar to MOPERM, MEM is managed by a board, (section 287.905), which has the full power and authority to determine the rates to be charged by MEM for the insurance it provides (section 287.910). Similar to MOPERM, MEM receives no state appropriation (section 287.919.1), though MEM is authorized to issue revenue bonds. Section 287.919.2. Similar to MOPERM, MEM is not an agency of the state. *Compare* section 537.705.4, *with* section 287.902 (stating that MEM "shall not be a state agency"). Since the Court in *Casualty Reciprocal Exchange* could not readily conclude that MEM was performing a traditional governmental service, and instead discounted the value of the first *Stacy* requirement in order to find that MEM was a "public corporation," the similarities between MEM and MOPERM lend support to our conclusion that MOPERM does not satisfy the first *Stacy* requirement. 956 S.W.2d at 254-55.

For the reasons explained, we conclude that MOPERM does not satisfy the first *Stacy* requirement because it does not perform a traditional governmental service. We are mindful, however, of *Stacy's* admonition that "[i]n view of the broad range of activities in which the government is involved, it is difficult to envision a hybrid entity that meets the other [two *Stacy*] requirements but would not meet this one." *Stacy*, 836

24

S.W.2d at 919. Because we have already concluded that MOPERM satisfies the third *Stacy* requirement, it is advisable to analyze whether MOPERM satisfies the second *Stacy* requirement as a cross-check against our conclusion that MOPERM does not satisfy the first *Stacy* requirement.

### iii. MOPERM does not satisfy the second *Stacy* requirement because it is not controlled by and directly answerable to public officials, public entities, or the public

We next address whether MOPERM is an entity "controlled by **and** directly answerable to one or more public officials, public entities, or the public itself[,]" characterized by *Stacy* as the "most critical" requirement for determining whether a hybrid entity is a "public entity" for purposes of section 537.600.1. *Stacy*, 836 S.W.2d at 919 (emphasis added). Though *Stacy* did not explain why this requirement is the "most critical," we surmise it reflects a policy that a hybrid entity should not be afforded sovereign immunity protection unless the hybrid entity is meaningfully controlled by and accountable to the sovereign whose immunity it seeks to appropriate.

*Stacy* and *Casualty Reciprocal Exchange* addressed factors relevant to this requirement including: who has the authority to manage and operate the entity; how those with the authority to manage and operate the entity are selected; the extent to which the entity is managed and operated autonomously from the government or the public; whether the entity has reporting obligations to the government or the public; and whether reporting obligations foster accountability to the government or the public. *Stacy*, 836 S.W.2d at 919-21; *Casualty Reciprocal Exch.*, 956 S.W.2d at 253-55. These factors are neither exclusive, nor formalistic in their relative importance or application. Instead, a

25

hybrid entity's operation must be reviewed holistically to gauge whether its authorized function is being performed in a manner that is meaningfully controlled by and directly answerable to one or more public officials, public entities, or the public, as to justify an extension of the protective cloak of sovereign immunity.

**a.**

**Whether MOPERM is "controlled by" one or more public officials, public entities or the public**

We first examine whether MOPERM is "controlled by" one or more public officials, public entities, or the public. *Stacy*, 836 S.W.2d at 919. "The general administration of, and responsibility for, the proper operation of" MOPERM is managed through a board of trustees. Section 537.730.1. Thus, to determine whether MOPERM is subject to "control by" public officials, public entities, or the public, we must address the composition of MOPERM's board of trustees.

The composition and appointment of MOPERM's board of trustees is set by statute. Section 537.710.1. Section 537.710.1 provides that the board "shall consist of the attorney general, the commissioner of administration and four members, appointed by the governor with the advice and consent of the senate, who are officers or employees of those public entities participating in the fund." Based on this statutory requirement, it would appear that the board, and thus MOPERM, is "controlled by" public officials or public entities.

In concluding that TMC did not satisfy the second *Stacy* requirement, it was in part significant to the Supreme Court that a "majority of the board members are neither

26

appointed by nor subject to removal by public officials or the general public and have no connection to [the city], [the county], or the University of Missouri." 836 S.W.2d 919. The Court noted that "[t]he entire board determines policy by majority vote and the votes of the government-related directors are not weighted to give them control." *Id*. Conversely, in *Casualty Reciprocal Exchange*, where the *Stacy* requirements were examined for a purpose other than determining eligibility for sovereign immunity, the Court concluded that the second *Stacy* requirement was sufficiently satisfied by MEM even though vacancies on MEM's board could be filled by a vote of policyholders, since MEM's enabling legislation required all of the initial members of the board to be appointed by the governor with the advice and consent of the senate, and since all board members at that time had been so appointed. 956 S.W.2d at 255.

Between the bookends of these decisions, and given the statutorily required composition of MOPERM's board of trustees, we conclude that MOPERM is subject to "control by" one or more public officials, public entities, or the public.[13] *Stacy*, 836 S.W.2d at 919.

### b.

### Whether MOPERM is "directly answerable to" one or more public officials, public entities or the public

The second *Stacy* requirement also requires that a hybrid entity be "directly answerable to" one or more public officials, public entities, or the public. *Id.* Though a hybrid entity's governing board may be "controlled by," (that is, populated by), public

---

[13]*But see* the discussion, *infra*, noting that the two high-ranking state officials required by statute to serve on MOPERM's board of trustees do not, in fact, serve on the board.

officials or public entities, it does not necessarily follow that the hybrid entity is "directly answerable to" public officials, public entities, or the public. To have meaning, the "directly answerable to" feature of the second *Stacy* requirement must be distinguished from the "controlled by" feature to require a hybrid entity to demonstrate that the entity and its governing board are meaningfully accountable to the sovereign whose immunity the hybrid entity seeks to appropriate.

In *Stacy*, the Supreme Court concluded that TMC did not satisfy the requirement of being "controlled by *and* directly answerable to" public officials, public entities, or the public because:

> No governmental body approves the decisions of the board. Such reporting as exists is after the fact; control remains in the independent board. We hold this is not the kind of accountability to public officials or to the general public required to support an application of sovereign immunity.

836 S.W.2d at 919. The same is true with MOPERM.

MOPERM's board of trustees is afforded broad and expansive powers, namely all of "the powers and duties specified in sections 537.700 to 537.755 and such other powers as may be necessary or proper to enable it, its officers, employees and agents to carry out fully and effectively all the purposes of sections 537.700 to 537.755."[14] Section 537.700.1. MOPERM's purpose is to provide optional liability coverage to public entities and their officers and employees. Section 537.705.1. In exercising and performing that purpose, MOPERM's board of trustees has the sole and exclusive authority to "negotiate

---

[14]MOPERM's staff is provided by the Office of Administration except as otherwise determined by the board of trustees. Section 537.705.4. However, MOPERM is required to reimburse the Office of Administration annually "for all costs of providing staff" pursuant to a contract negotiated between MOPERM and the Office of Administration. *Id*.

the settlement of and provide the defense of any claim for which coverage has been obtained by any public entity," and to "make the final determination on the settlement of any claim, or any portion of any claim, that requires payment from the fund." Section 537.705.3.

MOPERM's enabling legislation imposes no reporting obligations on MOPERM's board, and no means by which the board's exercise of its broad powers and duties can be measured or assessed to ensure fidelity to MOPERM's purpose or function. Specifically, there is no obligation imposed on the board to account to public officials, public entities, or the public for the manner in which the board manages, settles, or pays judgments entered or claims made against MOPERM's insureds.[15]

Section 537.730 underscores the independent operation of the board of trustees by providing, among other things, that:

> 1. The general administration of, and responsibility for, the proper operation of the fund, including all decisions relating to payments from the fund, are vested in the board of trustees.
>
> 2. The board shall determine and prescribe all rules, regulations, coverages to be offered, forms and rates to carry out the purposes of sections 537.700 to 537.755.
> . . . .
>
> 4. Subject to the provisions of the constitution and section 537.700 to 537.755, the board shall have exclusive jurisdiction and control over the funds and property of the fund.
> . . . .

---

[15]In contrast, the SLEF, which is not an entity at all, and is instead a dedicated appropriation of state funds, is subject to specific reporting obligations directly relating to its "insuring" function. Section 105.713.1 requires the Attorney General and the Commissioner of Administration to submit monthly, detailed reports to the General Assembly "detailing all settlements and judgments paid in the previous month" from the SLEF.

7.    The board shall have the authority to use moneys from the fund to purchase one or more policies of insurance or reinsurance to cover the liabilities of participating public entities which are covered by the fund.

8.    If such insurance can be procured, the board shall have the authority to procure insurance covering participating entities and their officers and employees for amounts in excess of the amount specified by section 537.756 per occurrence for liabilities covered by the fund.  The costs of such insurance shall be considered in determining the contribution of each entity.

Section 537.730.  In addition, the board of trustees has the sole and exclusive authority to determine the amount of the annual contributions to be made to the fund by all public entities who exercise the option to participate in the fund.  Section 537.705.1.  Though the board is directed by section 537.705.1 to determine annual contributions "in accordance with the provisions of section 379.470 relating to rates established by insurers[,]" MOPERM is not regulated by the Department of Insurance, leaving the board's rate setting function unmonitored for compliance with section 379.470.

MOPERM has a single statutory reporting requirement, as it must submit an annual "statement covering the operations of the fund for the year, including income and disbursements, and of the financial condition of the fund" to the governor, and it must "be made readily available to public entities." Section 537.725.2.  But MOPERM is not required to undergo an independent financial audit.  And the financial statement it submits annually is submitted after the fact, and is not subject to statutory benchmarks or standards against which MOPERM's operations are evaluated, or subjected to regulatory oversight or intervention.

30

As was the case in *Stacy*, no governmental body approves, reviews, oversees, evaluates, or regulates the decisions of the board of trustees of MOPERM, and reporting by MOPERM, such as it exists, is after the fact. 836 S.W.2d at 919.

As noted above, we do not believe a hybrid entity can satisfy the "directly answerable to" feature of the second *Stacy* requirement merely because it "controlled by" (populated by) public officials, public entities, or the public itself. A hybrid entity's governing body is not "directly answerable to" anyone unless the actions of the governing body are subject to reporting obligations or some other mechanism designed to assure and enable meaningful accountability. But even if the mere composition of a hybrid entity's governing body could hypothetically satisfy both the "controlled by" and "directly answerable to" features of the second *Stacy* requirement, we would not conclude that MOPERM's board does so.

Although MOPERM's board is required to include the Attorney General and the Commissioner of the Office of Administration, Estes points out that neither of these high-ranking public officials actually sits on the board. During the time period that MOPERM provided a defense to Hughes for Estes's claims in the Underlying Lawsuit, an assistant attorney general sat on the board as a representative for the Attorney General, and an attorney sat on the board as a representative for the Commissioner of the Office of Administration. Although statutory authority might exist permitting an appointed designee to lawfully act in the stead of one or both of these state officials, MOPERM has not pointed us to that authority, and has therefore failed to establish, as a matter of law, that MOPERM's board effectively includes these statutorily required members. The

31

remaining members of the board during the same time frame included an in-house attorney for a school district; a county clerk; and a city manager.[16] There is no indication that these public entity representatives are accountable in any meaningful manner for their service on MOPERM's board of trustees to the public entity with whom they are employed or to any other participating public entity. Moreover, there is no provision for removal of a MOPERM board member, except for section 537.730.6, which states that a trustee is subject to removal if the trustee "accept[s] any gratuity or compensation for the purpose of influencing his action with respect to the investment of funds of the system or in the operation of the fund[.]"

We conclude that MOPERM and its board of trustees are not "directly answerable to" public officials, public entities, or the public itself. MOPERM's enabling legislation does not require "the kind of accountability to public officials or to the general public required to support an application of sovereign immunity." *Stacy*, 836 S.W.2d at 919. Instead, and for all intents and purposes, MOPERM's board of trustees operates autonomously, with near unfettered authority.

We are by no means suggesting that MOPERM's independence is inappropriate or unlawful, or that MOPERM's operations are untoward or inscrutable. That, however, is not the question we have been asked to resolve. The question we have been asked to resolve is whether MOPERM is "enough like a public entity that it is entitled to sovereign

---

[16]There was apparently an unfilled vacancy on the board at the time, as section 537.710.1 requires a total of six board members.

32

immunity under section 537.600." *Stacy*, 836 S.W.2d at 917. With respect to the second *Stacy* requirement, the answer is no.

Undeterred, MOPERM argues that its board of trustees is very similar to the board of directors for MEM, which the Supreme Court determined in *Casualty Reciprocal Exchange* "satisfie[d] the public control element of the public corporation analysis in substantial part[.]" 956 S.W.2d at 255. MOPERM's argument ignores, as we have already explained, that although the Supreme Court in *Casualty Reciprocal Exchange* drew upon the *Stacy* requirements, it did not do so for the purpose of determining whether MEM enjoyed sovereign immunity, and instead did so to determine whether the formation of MEM violated the Missouri Constitution. *Id.* at 253. The conclusion reached about MEM is not relevant, as we examine the second *Stacy* requirement for an entirely different purpose--to determine whether MOPERM enjoys sovereign immunity. *See*, *e.g.*, *Trimble*, 745 S.W.2d at 674 (holding that Bi-State was a public entity for purposes of sovereign immunity despite a prior court decision which concluded that Bi-State was not a political subdivision of the state for purposes of determining appropriate appellate court jurisdiction because the earlier case "***involved considerations quite separate from the questions of [sovereign] immunity presented here***" (emphasis added) (citing *St. Louis Transit Co. v. Div. of Emp't. Sec.*, 456 S.W.2d 334 (Mo. banc 1970))).

Even if the determination in *Casualty Reciprocal Exchange* is relevant, as MOPERM argues, the Supreme Court found only that MEM "satisfie[d] the public control element of the public corporation analysis in substantial part." 956 S.W.2d at 255. Given the materially different reporting obligations and accountability measures

33

imposed on MEM, we cannot reach the same conclusion with respect to MOPERM. Where MOPERM's board of trustees has the authority to "determine and prescribe all . . . coverages to be offered, forms and rates . . . ," (section 537.730.2), MEM's insurance policies and coverage determinations are "subject to the approval of the director of the department of commerce and insurance." Section 287.902. Where MOPERM is not regulated or controlled by any state agency, MEM "is subject to all provisions of the statutes which relate to private insurance carriers and to the jurisdiction of the department of commerce and insurance in the same manner as private insurance carriers[.]" Section 287.920.5. In addition, MEM is required to "be a member of the Missouri property and casualty guaranty association, sections 375.771 to 375.779[.]" Section 287.902. Though the boards of both MOPERM and MEM enjoy the authority to perform all acts necessary to carry out their business, (section 537.700.1; section 287.907.2), MEM is subject to rigorous reporting requirements, while MOPERM is not. MEM is required to conduct "an annual audit of the books of accounts, funds and securities of the company to be made by a competent and independent firm of certified public accountants . . ." Section 287.920.1. MEM's board must submit "an annual independently audited report in accordance with procedures governing annual reports adopted by the National Association of Insurance Commissioners" to the governor and general assembly, and "shall indicate the business done by the company during the previous year and contain a statement of the resources and liabilities of the company." Section 287.920.2. MEM is required to ascertain "[t]he incurred loss experience and expense of the company . . . each year to include . . . estimates of outstanding liabilities for claims reported to the company

34

but not yet paid and liabilities for claims arising from injuries which have occurred but have not yet been reported to the company." Section 287.290.4. The department of commerce and insurance conducts an examination of MEM "in the manner and under the conditions provided by the statutes of the insurance code for the examination of insurance carriers." Section 287.920.5. MOPERM's singular obligation under section 537.725.1 to provide an annual "statement covering the operations of the fund for the year, including income and disbursements, and of the financial condition of the fund . . ., showing the valuation and appraisal of its assets and liabilities . . . ." stands in sharp contrast to the regulatory oversight imposed on MEM. Comparing MOPERM to MEM, it cannot be said that MOPERM satisfies at all, let alone "substantially," the second *Stacy* requirement that a hybrid entity be "directly answerable to" public officials, public entities, or the public. 836 S.W.2d at 919.

Section 537.705.4 lends further support to our conclusion, as it provides that MOPERM:

> is a body corporate and politic and the state of Missouri shall not be liable in any way with respect to claims made against the fund or against entities or individuals covered by the fund, nor with respect to any expense of operation of the fund. Money in the fund is not state money nor is it money collected or received by the state.

This provision expresses the General Assembly's intent that although MOPERM is a legislatively formed statewide entity, MOPERM cannot subject the state to liability because MOPERM is not the state, is not funded by the state, and does not hold money

35

belonging to the state.[17] It follows that MOPERM is not "directly answerable to" the state--the sovereign that created MOPERM. *Stacy*, 836 S.W.2d at 919.

Estes observes that similar language as appears in section 537.705.4 has led to the conclusion in other cases that a statewide fund does not have sovereign immunity. In *Rees Oil Co. v. Dir. of Revenue*, 992 S.W.2d 354, 358 (Mo. App. W.D. 1999), we found that a suit against the Petroleum Storage Tank Insurance Fund ("PSTIF") was not barred by sovereign immunity because, although the PSTIF was created by state legislation, the PSTIF is not a state fund. To reach this conclusion, we expressly relied on PSTIF's enabling legislation, which provided that "[m]oneys in such special trust fund shall not be deemed to be state funds[.]" Section 319.129.1. We reached the same conclusion for the same reason in *River Fleets, Inc. v. Carter*, 990 S.W.2d 75, 77 (Mo. App. W.D. 1999). We also noted in *River Fleets* that section 319.131.4 provides that "'the liability of the [PSTIF] is not the liability of the state of Missouri.'" *Id*. at 78 (quoting section 319.131.4). We relied on that provision to conclude that "[i]f the fund's liability is not the liability of the state of Missouri, then, ipso facto, the State's immunity from liability does not apply." *Id*.[18]

---

[17]The same is true for MEM which, although authorized to operate statewide, is expressly declared "not [to] be a state agency." Section 287.902.

[18]MOPERM attempts to distinguish *Rees* and *River Fleets* by arguing that both cases turned on the difference between "state funds" and "non-state funds" as described in Article IV, section 15 of the Missouri Constitution. We disagree. Though both cases did refer to this constitutional provision, and noted that as a result, certain fees paid into the PSTIF were to be administered by the Department of Revenue as "non-state funds," the sovereign immunity holding in these cases did not depend on whether the Department of Revenue had the authority to administer the "non-state funds." *Rees*, 992 S.W.2d at 358; *River Fleets*, 990 S.W.2d 77-78. If anything, MOPERM's enabling legislation solidifies the separation between MOPERM and the state, as section 537.735 provides that all "contributions, premiums, and income from all sources" received by MOPERM, (described by section 537.705.4 as "not state money"), are to be deposited in a MOPERM account at "one or more banks or trust companies." Sections 537.735.1 and .2.

The similarities between section 537.705.4, and sections 319.129.1 and 319.131.4, cannot be ignored. However, the PSTIF is a special fund and not a legal entity,[19] meaning the PSTIF is not susceptible to *Stacy*'s "hybrid entity" analysis for determining eligibility for sovereign immunity. 836 S.W.2d at 919. Because of that important distinction, we are not prepared to conclude that *Rees* and *River Fleets* are controlling in this case, as they do not address the *Stacy* requirements, and do not hold that the *Stacy* requirements are rendered immaterial when a legislatively created statewide legal entity (as compared to a mere fund) is declared by its enabling legislation not to be "the state."

However, though *Rees* and *River Fleets* are not controlling, they are nonetheless instructive. At a minimum, they support the proposition that legislatively created statewide entities are not "directly answerable to" the sovereign whose immunity the entity wishes to appropriate when the entity's enabling legislation unequivocally declares that moneys held by the entity are not state funds, or that the entity's actions cannot be relied upon to hold the state liable.[20]

---

[19]*See City of Harrisonville v. McCall Serv. Stations*, 495 S.W.3d 738, 751-52 (Mo. banc 2016), discussed *infra*.

[20]We question the utility of the *Stacy* "hybrid entity" requirements when the entity that is seeking to establish that it has sovereign immunity is a legislatively created entity, with statewide operations, and no plausible means by which it could be argued to be a local or regional entity or political subdivision. 836 S.W.2d at 919. It seems more appropriate in such cases to limit the inquiry solely to whether the legislatively created statewide entity is the state or an agency of the state. *See P.L.S. ex rel. Shelton*, 360 S.W. 3d at 808-19 (differentiating between the state and agencies of the state from other public entities that may enjoy sovereign immunity but that are not covered by the SLEF). However, neither *Stacy*, nor any Missouri Supreme Court case since *Stacy*, has suggested that the *Stacy* hybrid entity requirements only apply to local or regional (as opposed to statewide) entities. *Id.* And, we cannot ignore that, although the Supreme Court was resolving an issue other than sovereign immunity in *Casualty Reciprocal Exchange*, it nonetheless drew upon the *Stacy* requirements to determine whether MEM, a legislatively created statewide entity, was a public corporation. 956 S.W.2d at 253-55.

In summary, MOPERM does not satisfy the second *Stacy* requirement as it is not "controlled by and directly answerable to" public officials, public entities, or the public. 836 S.W.2d at 919.

Because MOPERM does not satisfy either the first or second *Stacy* requirements, MOPERM is not "enough like a public entity that it is entitled to sovereign immunity[.]" *Id.* at 917. As such, Estes's claims for bad faith failure to settle and breach of fiduciary duty against MOPERM and its board of trustees are not barred on the basis of sovereign immunity. The trial court erred as a matter of law in granting summary judgment to MOPERM and its board of trustees for the stated reason that MOPERM has sovereign immunity.

Points one and two on appeal are granted.

### III.

***Point Three: The Trial Court's Grant of Summary Judgment is not Supported by any of the Alternative Bases Raised in the Motion for Summary Judgment***

Estes's third point on appeal addresses the other potential bases for summary judgment raised in MOPERM and the board of trustees' motion for summary judgment, but not expressly relied on in the trial court's Judgment. We are to "affirm the trial court's summary judgment on any ground supported by the record, whether relied on by the trial court or not." *Sisk*, 138 S.W.3d at 809 (quotation omitted).

MOPERM and the board of trustees' motion for summary judgment alleged MOPERM does not owe a duty of good faith to attempt to settle within policy limits to those covered by a memorandum of coverage because MOPERM is not a liability insurer,

38

and merely administers a self-insurance pool. The motion for summary judgment also argued that MOPERM's enabling legislation precludes the use of money in the fund to pay the claims asserted by Estes. And the motion for summary judgment argued that Estes's claims were precluded as a matter of law because MOPERM is prohibited from paying more than $2,000,000 for all claims arising out of a single occurrence, and has already paid out that amount. Estes's third point on appeal contests each of these alternative bases for summary judgment.[21]

## A.

### MOPERM is a liability insurer and owes its insureds a duty to act in good faith to attempt to settle within policy limits

We begin with MOPERM's contention that it is not a liability insurer, and therefore does not owe those covered by a memorandum of coverage a duty to act in good faith in negotiating and settling claims. Based on this contention, MOPERM argued in the motion for summary judgment that it cannot be sued for bad faith failure to settle as a matter of law.

---

[21]MOPERM argues that Estes's third point relied on is multifarious in violation of Rule 84.04(d). "'A point relied on violates Rule 84.04(d) when it groups together multiple, independent claims rather than a single claim of error, and a multifarious point is subject to dismissal.'" *Sanders v. City of Columbia*, 602 S.W.3d 288, 296 n.5 (Mo. App. W.D. 2020) (quoting *Kirk v. State*, 520 S.W.3d 443, 450 n.3 (Mo. banc 2017)). Estes's third point on appeal is multifarious as it argues that the trial court's Judgment cannot be affirmed on any of three alternative bases raised in the motion for summary judgment. "However, because this court prefers to decide a case based on the merits, and because the substance of [Estes's] challenge is discernable from [her] argument, we review [her] claims for their merit." *Id.* It is particularly appropriate to exercise our discretion to entertain the multifarious claims raised in Estes's third point on appeal here, as to do otherwise would subject Estes to the draconian outcome of dismissal of her appeal in its entirety. *See STRCUE, Inc. v. Potts*, 386 S.W.3d 214, 219 (Mo. App. W.D. 2012) (holding that an appellant's failure to challenge on appeal every basis that could support affirming a trial court's judgment is fatal to the appeal, and requires the appeal to be dismissed).

39

"Inherent in a policy of insurance is the insurer's obligation to act in good faith regarding settlement of a claim." *Am. Cas. Co. of Reading*, 399 S.W.3d at 74 (quotation omitted).

> [A] bad faith refusal to settle action will lie when a ***liability insurer***: (1) reserves the exclusive right to contest or settle any claim; (2) prohibits the insured from voluntarily assuming any liability or settling any claims without consent; and (3) is guilty of fraud or bad faith in refusing to settle a claim within the limits of the policy.

*Scottsdale Ins. Co. v. Addison Ins. Co.*, 448 S.W.3d 818, 827 (Mo. banc 2014) (emphasis added). Thus, in order for MOPERM to be subject to a claim for bad faith refusal to settle, we must determine whether MOPERM is a liability insurer.

MOPERM argues that it is not a liability insurer and that it merely "manages a pool of public funds contributed by its members" to cover their liabilities. [Respondent's Brief, p. 33] In so arguing, MOPERM seeks to recast itself from a body corporate and politic authorized to extend insurance coverage in exchange for the payment of annual premiums, to nothing more than the administrator of a pool of self-insurance funds. This argument distorts section 537.705.1 which provides that a public entity's "[p]articipation in the fund ***has the same effect as*** purchase of insurance by the public entity, as otherwise provided by law, and shall ***have the same effect as*** a self-insurance plan adopted by the governing body of any political subdivision of the state." (Emphasis added.) The phrase "the same effect as" does not convert the MOPERM fund into a self-insurance pool, or MOPERM into a mere administrator of a self-insurance pool.[22]

---

[22]The cases relied on by MOPERM in point III of its brief for the purported proposition that other states "consistently hold that local government risk management pools have sovereign immunity" are readily

40

Instead, the phrase "the same effect as" simply confirms that a public entity's participation in MOPERM waives sovereign immunity to the extent of coverage as would be the case if the public entity purchased insurance for tort claims as permitted by section 537.610.1, or adopted a co-op self-insurance plan as permitted by section 537.620.[23] *See Moore v. Lift for Life Acad, Inc.*, 489 S.W.3d 843, 846 (Mo. App. E.D. 2016) (observing that participation in MOPERM constitutes a waiver of a public entity's sovereign immunity to the extent of coverage provided in the memorandum of coverage); *see also* section 537.745 (providing that MOPERM's enabling legislation does not "broaden or restrict the liability of the public entities participating in the fund beyond the provisions of sections 537.600 to 537.610").

MOPERM's argument also disregards that MOPERM has routinely been treated by our courts as a liability insurer subject to the same duties and rules of contract construction applicable to all other liability insurers. "'MOPERM functions like a liability insurance carrier and issues to each insured a 'memorandum of coverage.'" *Gilley*, 437 S.W.3d at 320 n.6 (quoting *Am. Cas. Co. of Reading*, 399 S.W.3d at 71). *See County of Scotland v. Mo. Pub. Entity Risk Mgmt. Fund*, 537 S.W.3d 358, 363 (Mo. App. W.D. 2017) (observing that MOPERM's memorandum of coverage is interpreted as an insurance policy and addressing MOPERM's duty to defend an insured employing the

---

distinguishable as each is controlled by, and thus limited in its precedential value to, the peculiarities of the relevant enabling legislation involved in the case. [Respondent's Brief, p. 24]

[23]Section 537.620 permits any "three or more political subdivisions of this state [to] form a business entity for the purpose of providing liability insurance" funded by assessments. Importantly, any entity formed to provide "self-insurance" in this manner is expressly declared by section 537.620 to *not* be an insurance company, to *not* be deemed to be transacting insurance business, and to *not* have issued contracts of insurance. The absence of similar language in MOPERM's enabling legislation stands in stark contrast, and lends strong support to the conclusion that MOPERM is an insurance company, is engaged in the transaction of insurance business, and enters into a contract of insurance when it issues a memorandum of coverage.

41

same standard applied to other liability insurers); *City of Lee's Summit v. Mo. Pub. Entity Risk Mgmt. Fund*, 390 S.W.3d 214, 219-20 (Mo. App. W.D. 2012) ("As the insured, the City bears the burden of proving coverage under the policy. MOPERM, the insurer, bears the burden of proving the applicability of any coverage exclusion." (citation omitted)); *Borges v. Mo. Pub. Entity Risk Mgmt. Fund*, 358 S.W.3d 177, 182 (Mo. App. W.D. 2012) (In rejecting a third party claimant's contention that MOPERM is a public entity, rather than an insurance company, our Court stated that MOPERM's "coverage of public entities is similar to, if not indistinguishable from, the coverage that insurers provide to insureds." (citing section 537.705.1)); *Topps v. City of Country Club Hills*, 272 S.W.3d 409, 415-18 (Mo. App. E.D. 2008) (treating MOPERM memorandum of coverage as a contract of insurance subject to interpretation by applying traditional rules of contract construction); *Charles Maggard Agency, Inc. v. Mo. Pub. Entity Risk Mgmt. Fund*, 974 S.W.2d 671, 672 (Mo. App. W.D. 1998) ("MOPERM is a liability insurance carrier that has an agency agreement with Maggard.").

Certainly, when it has served MOPERM's interests to do so, MOPERM has characterized itself as a liability insurer. MOPERM initiated claims for breach of duty, equitable subrogation, unjust enrichment, and equitable contribution against another insurer in *Reading*, 399 S.W.3d 68, after MOPERM (which had issued excess coverage) settled a wrongful death action because the primary liability insurer refused to participate in settlement discussions. MOPERM's theories of recovery depended on MOPERM's status as a liability insurer. *See, e.g.*, *id*. at 74-75 ("'Under the doctrine of equitable subrogation, 'an excess insurer, paying a loss under a policy, "stands in the shoes" of its

42

insured with regard to any cause of action its insured may have against a primary insurer responsible for the loss.'" (quoting *Royal Ins. Co. of Am. v. Caliber One Indem. Co.*, 465 F.3d 614, 619 (5th Cir. 2006))).  On appeal from the grant of summary judgment in favor of the primary liability insurer, we reversed, and observed that:

> [U]nder the particular facts of the case at bar, in avoiding the additional costs of litigation, which would have impacted both insurers, in settling the case before the additional damaging facts were disclosed, which would have substantially increased the value of plaintiff's claim, ***in maintaining its duty to settle in good faith***, and in facing [the primary insurer's] denial of primary coverage for [insured] and refusal to participate in good faith in the settlement, ***MOPERM advanced facts, which if proven***, would have provided sufficient reason to intervene by payment to the plaintiffs and so to be subrogated to the rights of [insured] in the underlying action on that debt.

*Id*. at 76 (emphasis added).  It is disingenuous for MOPERM to rely on its status as a liability insurer with a duty to settle in good faith in order to pursue claims against another liability insurer, while denying it owes any such duty in this case.

Moreover, MOPERM's enabling legislation describes authorized activities that are aligned with those of other liability insurers.  MOPERM's board of trustees is authorized to retain and compensate insurance brokers and agents to sell coverage to public entities. Section 537.705.6; *see Charles Maggard Agency, Inc.*, 974 S.W.2d at 673-74 (insurance agent possessed a right to renewal commissions under his agency agreement with MOPERM, the liability insurance carrier, for policies placed before the agreement between MOPERM and the insurance agent terminated).  MOPERM's board of trustees has the authority to purchase "insurance or reinsurance to cover the liabilities of participating public entities which are covered by the fund."  Section 537.730.7.  *Cf. Am.*

*Nat. Life Ins. Co. of Texas v. Dir. of Revenue*, 269 S.W.3d 19, 21 (Mo. banc 2008) ("[R]einsurance premiums [] are paid by the primary insurer to a reinsurer, after the insured directly pays the initial premium to the primary insurer. The primary insurer cedes the policy's risks to a reinsurer."). MOPERM's board is required to calculate the annual contribution or premium to be paid by a public entity "in accordance with the provisions of section 379.470 relating to rates established by insurers."[24] Section 537.705.1. As would be the case with any liability insurer, if a public entity fails to make its annual contribution to MOPERM, it loses coverage. Section 537.705.3. Finally, as with any liability insurer, MOPERM is obligated to pay claims to the extent of the coverage described in a memorandum of coverage. Section 537.705.1(1) (providing that moneys in the fund shall be available for the "payment and settlement of all claims for which coverage has been obtained by any public entity in accordance with coverages offered by the board"); *see Naucke*, 95 S.W.3d at 169 (holding that the scope of required coverage is controlled by MOPERM's memorandum of coverage).

In light of the foregoing, we conclude that MOPERM is a liability insurer. As such, implied in every memorandum of coverage MOPERM issues is the duty to act in good faith in negotiating and settling claims. The imposition of this duty aligns with section 537.705.3 which affords MOPERM's board of trustees the sole and exclusive power to "negotiate the settlement of and provide the defense of any claim for which coverage has been obtained by any public entity in accordance with coverages offered by

---

[24]Section 379.470 is a part of the "Casualty and Surety Rate Regulation Law," sections 379.420 to 379.510, and addresses the rate, or premium, that insurers can charge for casualty insurance.

44

the board." Similar provisions in insurance policies serve as the origin of the duty imposed on liability insurers to act in good faith in attempting to settle claims within an insured's policy limits. *See Ganaway v. Shelter Mut. Ins. Co.*, 795 S.W.2d 554, 556 (Mo. App. S.D. 1990) (". . . a liability insurer, having assumed control of the right to settle claims against the insured, may become liable in excess of its undertaking under the policy provisions if it fails to exercise good faith in considering offers to compromise the claim for an amount within the policy limits."). "The cause of action in tort for breach of the obligation of fair dealing presupposes an insurer and insured in a subsistent fiduciary relationship." *Varnal v. Weathers*, 619 S.W.2d 825, 827 (Mo. App. W.D. 1981).

The imposition of a duty on MOPERM to act in good faith to attempt to settle within policy limits is also consistent with the Unfair Claims Settlement Practices Act ("the Act"), sections 375.1000 to 375.1018, which "set[s] forth standards for the investigation and disposition of claims arising under contracts or certificates of insurance." Sections 375.1000. Section 375.1002(2) defines "insurer" as:

> [A]ny ***person***, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, ***and any other legal entity engaged in the business of insurance***, including agents, brokers, adjusters, public adjuster and third party administrators. 'Insurer' shall also mean health services corporations, health maintenance organizations, prepaid limited health care service plans, dental, optometric and other similar health service plans. For the purposes of sections 375.1000 to 375.1018, these foregoing entities shall be deemed to be engaged in the business of insurance. 'Insurer' shall also include all companies organized, incorporated or doing business under the provisions of chapters 325, 375, 376, 377, 378, 379, 381 and 383[.]

(Emphasis added.) As a body corporate and politic, MOPERM is both a person and a legal entity. *See* section 1.020(12) (defining "person" as used in "the statutory laws of

45

this state" to "extend and be applied to bodies politic and corporate"); *Boyd v. Kansas City Area Transp. Auth.*, 610 S.W.2d 414, 416 (Mo. App. W.D. 1980) (holding that "when the ATA was created as a body corporate and politic it became, in fact, a corporation"). Section 375.1002(4) defines "policy," "certificate," or "contract" to "include[] any contract of insurance . . . proposed for issuance, or intended for issuance by an insurer[,]" subject to delineated exceptions not relevant here. A MOPERM memorandum of coverage is a contract for insurance as its terms control coverage. Section 537.705.1(1) and (2) (providing that moneys in the fund shall be available to pay claims against participating public entities and the officers and employees of participating entities to the extent that "coverage has been obtained . . . in accordance with coverages offered by the board"); *Topps*, 272 S.W.3d at 415-18 (treating MOPERM memorandum of coverage as a contract of insurance subject to interpretation by employing traditional principles of contract construction). As a person or legal entity engaged in the business of insurance, MOPERM thus falls within the definition of an "insurer" pursuant to section 375.1002(2), and is subject to the Act. While a violation of the Act does not authorize a private cause of action, (section 375.1000.2), the Act is nonetheless "an expression of public policy in respect to such claims." 30 Mo. Prac., *Insurance Law & Practice*, section 7:40 (2d ed.) Relevant here, the Act describes improper claims practices to include, *inter alia*, the failure to "attempt[] in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear[.]" Section 375.1007(4).

46

Because MOPERM is a liability insurer, Estes's claims in tort against MOPERM, which are really Hughes's claims that were assigned to Estes, are cognizable. Hughes was an insured under PCS's memorandum of coverage from MOPERM. MOPERM's duty to act in good faith to attempt to settle Estes's claims against Hughes in the Underlying Lawsuit within policy limits was of particular importance to Hughes. Unlike a public entity, which is protected from liability for the acts of its officers and employees by sovereign immunity, the officers and employees of a public entity do not enjoy section 537.600.1 sovereign immunity,[25] and are not protected by the statutory "cap" for recovery from public entities where sovereign immunity is waived as set forth in section 537.610.2. *Cravens*, 234 S.W.3d at 449 (holding that sovereign immunity "bars holding the government or its political subdivisions liable for the torts of its officers or agents unless such immunity is expressly waived"); *Cottey*, 24 S.W.3d at 129 (holding that "the limitation on liability where sovereign immunity is waived applies only to the public entity and not to an agent of the entity" (citing *Trimble*, 745 S.W.2d at 675)). And, unlike a public entity, officers and employees of a public entity are not protected against awards for damages that include punitive or exemplary damages. Section 537.610.3. As a result, officers and employees of a public entity who are covered under a MOPERM memorandum of coverage are susceptible to an award for damages that could exceed the $2,000,000 payment cap set forth by section 537.756.1 for "claims arising out of any

---

[25]Officers and employees of a public entity may be eligible for other defenses, such as official immunity. *See* section 537.745.1 (providing that MOPERM's enabling legislation "shall [not] be construed to broaden or restrict the liability of the public entities participating in the fund beyond the provisions of sections 537.600 to 537.610, nor to abolish or waive any defense at law which might otherwise be available to any public entity or its officers and employees").

47

single occurrence," and that could include punitive damages. *See Naucke*, 95 S.W.3d at 169 (holding that the issue of coverage or punitive damage award is controlled by MOPERM's memorandum of coverage). There is no rationale grounded in law or policy for differentiating between MOPERM and all other liability insurers when it comes to the duty to act in good faith to attempt to negotiate settlements within policy limits. But for that duty, MOPERM would have no incentive to protect the interests of officers and employees of a participating public entity from excess judgments, even though coverage is extended to those individuals, and paid for by the public entity.

MOPERM's contention that it was entitled to summary judgment on Estes's claims because it is not a liability insurer is without merit as a matter of law and could not have served as an alternative basis for the trial court's grant of summary judgment.

**B.**

**MOPERM's enabling legislation does not prohibit Estes's claims**

We next examine MOPERM's contention that it was entitled to summary judgment because it is not subject to claims of the nature asserted by Estes. MOPERM alleges that use of moneys in the fund is restricted by section 537.735.1, which provides, in part, that "[a]ll property, money, funds, investments, and rights which shall belong to, or be available for expenditure or use by, the fund shall be dedicated to and held in trust for the purposes set out in sections 537.700 to 537.755 *and no other*." (Emphasis added.) MOPERM argues that because its enabling legislation does not expressly authorize use of moneys in the fund to pay claims in tort like those asserted by Estes, then MOPERM

48

cannot be sued for its tortious conduct. In effect, MOPERM seeks to secure through judicial construct what it is not otherwise entitled to--sovereign immunity.

There are multiple flaws in MOPERM's argument. First, it is uncontested that MOPERM is a body corporate and politic. Section 537.700.1. "The term 'body corporate' appears in the constitution and statutes of this state some ninety times. It is clear from a review of the way in which this term is used in the statutes that the legislature has consistently used it to refer to corporations both public and private." *Boyd*, 610 S.W.2d at 416 (holding that "when the ATA was created as a body corporate and politic it became, in fact, a corporation"). Corporations are legal entities that can sue and be sued. *See Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 120 (Mo. banc 2010) (noting that corporate entities are "distinct legal entit[ies] with the right to . . . sue and be sued"). "If a defendant wishes to deny a corporation's capacity to sue or be sued, that denial must be raised in the defendant's responsive pleading in accordance with Rule 55.13." *AllStar Capital, Inc. v. Wade*, 352 S.W.3d 633, 636 (Mo. App. E.D. 2011). Rule 55.13 provides that "[w]hen a person desires to raise an issue as to the . . . capacity of any party to sue or be sued . . . the person shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge." "Should a defendant's responsive pleading fail to assert this required specific negative averment, it will be considered an admission of . . . corporate status." *AllStar Capital, Inc.*, 352 S.W.3d at 636.

MOPERM's answer to Estes's first amended petition did not include a specific negative averment challenging MOPERM's capacity to be sued for Estes's claims because

49

its enabling legislation precluded Estes's claims.[26]  Instead, and in sharp contrast, MOPERM's answer admits that it is a body corporate and public, and affirmatively alleged that by suing the members of MOPERM's board of trustees in their official capacities, Estes's suit "is filed against MOPERM, the entity."  As a matter of law, MOPERM has admitted its legal capacity to be sued for the claims alleged in Estes's first amended petition.  Summary judgment can not be granted based on an unasserted or improperly pleaded affirmative defense, as a matter of law.  *Ditto, Inc. v. Davids*, 457 S.W.3d 1, 14-15 (Mo. App. W.D. 2014).

Second, MOPERM's enabling legislation in fact expressly contemplates that MOPERM can be sued.  Section 537.705.4 provides, in part, that MOPERM "*is a body corporate and politic*, and the state of Missouri shall not be liable in any way *with respect to claims made against the fund or against entities or individuals covered by the fund* . . . ."  (Emphasis added.)  Section 537.710.2 similarly provides that "[n]o trustee shall be liable personally in any way *with respect to claims made against the fund or against entities or individuals covered by the fund*."  (Emphasis added.)  The phrase "claims made against the fund" is plainly written, and necessarily refers to direct claims against MOPERM, particularly when the phrase is juxtaposed against reference to the separate category of "claims made against . . . entities or individuals covered by the fund."  Section 537.705.4; section 537.710.2.  Put simply, nothing in MOPERM's enabling legislation expressly provides that MOPERM is immunized from suit or liability

---

[26]In contrast to legal capacity to be sued, "[s]overeign immunity is not an affirmative defense; instead, when suing a public entity, the burden is on the plaintiff to plead facts with specificity that give rise to an exception to sovereign immunity."  *State ex rel. City of Kansas City v. Harrell*, 575 S.W.3d 489, 492 (Mo. App. W.D. 2019)

for its acts or omissions. *See Pippins v. City of St. Louis*, 823 S.W.2d 131, 133 (Mo. App. E.D. 1992) (holding that City Land Reutilization Authority was a public corporation, and could sue and be sued as its enabling legislation included no indication of "legislature's intent to put LRA in singularly unique position of being able to sue but not be sued").

Finally, MOPERM's argument that it cannot be sued because moneys in the fund can only be used for purposes expressly described in the enabling legislation is not supported by MOPERM's enabling legislation.

Section 537.735.1 provides, in pertinent part, as follows:

> ***The board shall set up and maintain a*** Missouri public entity risk management ***fund account*** in which shall be placed all contributions, premiums, and income from all sources. ***All property, money, funds, investments, and rights which shall belong to, or be available for expenditure or use by, the fund shall be dedicated to and held in trust for the purposes set out in sections 537.700 to 537.755 and no other***. The board shall have power, in the name of and on behalf of the find, to purchase, acquire, hold, invest, . . . all property, rights, and securities, and enter into written contracts, all as may be necessary or proper to carry out the purposes of section 537.700 or 537.755.

(Emphasis added.) MOPERM argues that the highlighted text requires any use of moneys in the fund to be expressly authorized, and then reads this provision with section 537.705.1 to argue that "MOPERM funds are available only for three purposes: (1) to pay and settle all claims for any participating entity in accordance with that entity's coverage; (2) to pay and settle all claims for any officer or employee of any participating entity; and (3) to pay attorneys' fees and expenses incurred in the settlement and defense of such participating entities, their officers, and employees." [Respondent's Brief, p. 29] We do

51

not agree with MOPERM's construction of the phrase "and no other" in section 537.735.1, as the argument misconstrues the phrase "shall be available for" in section 537.705.1; ignores numerous references in MOPERM's enabling legislation permitting broad use of moneys in the fund; and ignores section 537.755 where the General Assembly identified the only uses of moneys in the fund that are expressly prohibited.

It is true that section 537.705.1(1)-(3) authorizes the use of MOPERM funds for the three purposes MOPERM describes. But section 537.705.1 is not written prohibitively, as MOPERM suggests. It is written prescriptively, as it provides that the "[m]oneys in the fund *shall be available for*" the three purposes thereinafter set forth. *Id*. The plain meaning of the phrase "shall be available for" is not to the exclusion of other uses, but instead requires money in the fund to be used for at least those purposes described in section 537.705.1(1)-(3).

This conclusion is reinforced by the fact that MOPERM's enabling legislation authorizes the use of moneys in the fund for numerous other purposes, including, without limitation:

- To reimburse the Office of Administration for all costs of providing staff (section 537.705.4)

- To contract with independent insurance agents, authorizing the agents to sell insurance to public entities in exchange for compensation (section 537.705.6)

- To purchase one or more policies of insurance or reinsurance to cover the liabilities of public entities covered by the fund (section 537.730.7)

- To procure insurance covering participating public entities and their officers and employees for amounts in excess of the amount set forth in

52

section 537.756 as the limit that can be paid out per occurrence for liabilities covered by the fund (section 537.730.8)

- To assist participating entities is assessing and reducing the risk of liabilities which may be covered by the fund (section 537.730.9)

- To purchase, acquire, hold, invest, lend, lease, sell, assign, transfer, and dispose of all property, rights, and securities (section 537.735.1)

- To enter into written contracts as may be necessary or proper to carry out the purpose of MOPERM (section 537.735.1)

- To invest the funds of the fund as to earn a reasonable return (section 537.735.3)

- To select, employ, or contract with experienced insurance underwriters, accountants, claims servicers, or rate makers (section 537.740.2)

- To refund at the board's discretion, and on a pro rata basis to participating public entities, any fund balance in excess of projected needs (section 537.750.2)

- To pay claims on behalf of public entities to whom or to which a participating public entity is obligated by virtue of a written contract to provide coverage (section 537.755.3)

MOPERM's narrow construction of its enabling legislation to limit use of moneys in the fund to only those purposes described in section 537.705.1(1)-(3) cannot be reconciled with the aforesaid provisions which effectively authorize the use of moneys in the fund for virtually anything associated with the ordinary course of operation of the business of a liability insurer.

Moreover, the General Assembly was careful to specifically articulate in section 537.755 the only uses of moneys in the fund that are prohibited:

1. Except as provided in subsection 3 of this section, moneys in the Missouri public entity risk management fund shall not be available to pay the following:

   (1) Claims made under chapter 287;

   (2) Fines or penalties threatened or imposed for violation of any civil or criminal statute, administrative regulation or county or municipal ordinance;

   (3) Attorney's fees and expenses incurred in the defense of charges that criminal statutes or county or municipal ordinances were violated;

   (4) Claims against any participating public entity or officer or employee of a participating entity which were brought by or rendered in favor of any participating entity or officer or employee of a participating public entity acting in an official capacity;

   (5) Claims against those who are independent contractors with a participating public entity, its officers or employees;

   (6) Claims against participating public entities, its officers or employees who fail to cooperate with the persons conducting any investigation and preparing any defense as required by section 537.745.

2. No payment shall be made from the fund or any policy of insurance procured by the fund unless and until the benefits provided to pay the claim by any other policy of liability insurance have been exhausted.

Section 537.755. It is controlling that the payment of claims asserted against MOPERM is not on this list. "Where a statute incorporates no exception, a court should not insert one by judicial legislation." *Betts-Lucas*, 87 S.W.3d at 321.

Undeterred, MOPERM argued in its motion for its summary judgment that Estes's claims cannot be paid from the fund because the board is only authorized to require additional "contributions" from participating entities if "contributions to the fund do not produce sufficient funds to pay *any claims* which may be due." Section 537.740

54

(emphasis added).  According to MOPERM, since additional contributions can only be demanded from participating public entities if all "claims" cannot be paid, it follows that moneys in the fund can only be used to pay "claims."  Presupposing, for the sake of argument, that the word "claims" in section 537.740 refers only to third-party liability claims against participating public entities, or their officers and employees, (which we do not hold and need not address), the numerous statutory provisions referenced above authorizing broad use of moneys in the fund for virtually all purposes associated with the operation of a liability insurer dispel the flawed premise of MOPERM's argument.  In addition, MOPERM's argument ignores that annual "contributions" (*i.e.* premiums) paid by participating public entities are "in the amount determined by the board in accordance with the provisions of section 379.470 relating to rates established by insurers."  Section 537.705.1.  Section 379.470(4) permits any number of factors to be considered by an insurer in setting "rates" or premiums, including "past and prospective loss experience," "physical hazard," "catastrophe hazards," "a reasonable margin for underwriting profit and contingencies," "past and prospective expenses," and "*any other factors . . . which the insurer . . . deems relevant to the making of rates*."  (Emphasis added.)  If exposure to claims for breach of the duty to act in good faith in negotiating and settling claims against its insureds presents an organizational risk, then MOPERM is not prohibited from considering that risk in determining annual contributions to be paid by participating public entities.  In that respect, MOPERM faces no greater risk to the moneys in the fund than any other liability insurer, and commensurately, a public entity faces no greater burden in paying premiums to MOPERM than if it where to purchase insurance

55

elsewhere.  *Cf.* section 537.705.1 (noting that "[p]articipation in the fund has the same effect as purchase of insurance by the public entity. . .").  Finally, MOPERM's "depletion of the fund" argument ignores that section 537.750.1 contemplates exhaustion of the fund as it provides that:

> If the fund will be exhausted by the payment of *all judgments* and claims allowed during a particular fiscal year, *amounts paid to each* claimant or *person obtaining a judgment* shall be prorated, with each person receiving an amount equal to the percentage his own payment bears to the total of claims and judgments outstanding and payable from the fund.  Any amounts due and unpaid as a result of such proration shall be paid in the following fiscal year.

(Emphasis added.)  It is noteworthy that section 537.750.1 refers to "judgments" and "persons obtaining a judgment" without in any manner limiting those references to judgments entered against participating public entities or their officials or employees.

On appeal, MOPERM persists in its contention that moneys in the fund cannot be used to pay Estes's claims, and that as a consequence, MOPERM cannot be sued for those claims.  MOPERM argues that we are bound by the Supreme Court's decision in *City of Harrisonville v. McCall Service Stations*, 495 S.W.3d 738, 751 (Mo. banc 2016), which limited claims that could be asserted against the PSTIF to only those "claims" expressly authorized by the PSTIF's enabling legislation.

*City of Harrisonville* is distinguishable.  In that case, the City asserted tort claims against the PSTIF for negligence and fraudulent misrepresentation because the PSTIF's third-party administrator purportedly promised the City it would be reimbursed from the PSTIF for cleanup costs incurred to remediate contamination from a gas station's underground storage tank.  *Id*. at 743-44.  The General Assembly created the PSTIF as a

56

"special trust fund . . . within the state treasury" to provide insurance coverage to owners and operators of underground storage tanks "for the cleanup costs associated with spills and leaks. . ." *Id.* at 743; Section 319.129.1. Our Supreme Court found that section 319.131 describes only two instances where the PSTIF provides coverage:

> (1) the [PSTIF] will pay all of its participants' cleanup 'costs ... which are greater than ten thousand dollars but less than one million dollars per occurrence or two million dollars aggregate per year' and (2) the [PSTIF] 'shall provide coverage for third-party claims involving property damage or bodily injury caused by leaking petroleum storage tanks whose owner or operator is participating in the fund at the time the release occurs or is discovered.'

*Id.* at 751 (quoting sections 319.131.4-5). Our Supreme Court held that because the City's tort claims did not fall within either category, the claims were not cognizable, as there was "no authority for payment from the [PSTIF] for claims beyond those expressly articulated in section 319.131." *Id.*

MOPERM's enabling legislation is not akin to the enabling legislation authorizing the PSTIF. The PSTIF is merely an account administered by the state. *Id.* at 752 ("[T]he [PSTIF] is merely an account within the state's treasury.") Because the PSTIF is not a legal entity, it cannot be sued as such, and "cannot be liable for its own conduct." *Id.* "Instead, some person or entity must be authorized to [provide coverage, pay claims, or take other action] *using* the [PSTIF]." *Id.* As such, those authorized to "use" the PSTIF are strictly limited in their authority to the payment of claims against the fund authorized by section 319.131.

MOPERM concedes that ***"[u]nlike the PSTIF, MOPERM is not the name of an 'account' administered by [the state]. MOPERM is a separate 'body corporate and***

57

*politic.'"* [Respondent's Brief, p. 23] (emphasis added). We have already explained that as a body corporate, MOPERM can sue and be sued, and is thus liable for its own conduct. We have already explained that MOPERM's enabling legislation does not limit the use of moneys in the fund to the three uses described in section 537.705.1 for which moneys in the fund "shall be available." We have already explained that nothing in MOPERM's enabling legislation can be read to immunize MOPERM from liability for its own conduct, and instead, that MOPERM's enabling legislation expressly contemplates that claims may be made directly against MOPERM. And we have already explained that except as expressly delineated in sections 537.755.1 and .2, MOPERM's enabling legislation does not impose a limit on how moneys in the fund can be used. Finally, it is noteworthy that sections 537.705.1(1) and (2) provide that "[m]oneys in the fund shall be available for . . . (1) [t]he payment and settlement *of all claims for which coverage has been obtained* by any public entity in accordance with coverages offered by the board; (2) [t]he payment and settlement *of tort claims* against any officer or employee of a participating public entity *for which coverage has been obtained* by any public entity in accordance with coverages offered by the board . . . ." (Emphasis added.) As explained, *supra*, the duty to act in good faith to attempt to settle claims within policy limits is implied in every policy of insurance, and thus in every MOPERM memorandum of coverage. "Coverage obtained" by every participating public entity and the entity's officers and employees therefore includes MOPERM's duty to act in good faith to attempt

to settle claims within policy limits. MOPERM's reliance on *City of Harrisonville* is unavailing.[27]

MOPERM's contention that it was entitled to summary judgment because its enabling legislation prohibits claims of the nature asserted by Estes is without merit as a matter of law and could not have served as an alternative basis for the trial court's grant of summary judgment.

## C.

### MOPERM's enabling legislation does not preclude Estes's claims on the basis that they exceed the amount MOPERM is authorized to pay for all claims arising out of a single occurrence

Finally, we turn to MOPERM's contention that it is entitled to summary judgment because MOPERM's enabling legislation does not authorize MOPERM to use moneys in the fund to pay anything more than $2,000,000 for all claims arising out of a single occurrence. MOPERM appears to be arguing that because it could never have been required to pay more than $2,000,000 to settle Estes's claims against Hughes in the Underlying Lawsuit, it cannot be sued for bad faith failure to settle within those policy limits or for breach of fiduciary duty because it has now paid Estes $2,000,000 toward her claims against Hughes in the Underlying Lawsuit.

Section 537.756.1 provides, "The maximum amount which may be paid from the fund . . . for the payment and settlement of claims arising out of any single occurrence, is

---

[27]*City of Harrisonville* also found that the PSTIF's board of trustees and/or its individual members could be sued for claims arising out of the administration and operation of the PSTIF. 495 S.W.3d at 752. In the instant case, Estes has sued not only MOPERM, but also the individual members of MOPERM's board of trustees in their official capacities.

59

two million dollars."[28]  In connection with the Underlying Lawsuit, the phrase "claims arising out of any single occurrence" refers to the "claims" asserted by Estes against Hughes that arose out of the "single occurrence" of Doe being raped and impregnated by Hughes's husband while under Hughes's care.

In the instant case, however, the claims asserted by Estes against MOPERM and its board of trustees belonged to Hughes, MOPERM's insured, and have been assigned to Estes.  As a result, the claims asserted by Estes in this case arose out of a *different* occurrence--MOPERM's purported failure to exercise good faith in settling Estes's claims against Hughes in the Underlying Lawsuit within the policy limits, resulting in a judgment against Hughes in excess of the policy limits.  It defies logic to suggest that MOPERM cannot be sued for breach of the duties it owed Hughes, its insured, because MOPERM belatedly paid Estes the policy/statutory coverage limits for her claims against Hughes in the Underlying Lawsuit.  MOPERM's argument ignores that but for MOPERM's purported breach of the duties it owed Hughes, the Underlying Lawsuit could have been settled within policy limits, and no judgment against Hughes in excess of the policy limits would have been entered.  MOPERM's liability in tort for breach of the duties it owes an insured is not obviated by MOPERM's after-the fact remittance of policy limits toward partial satisfaction of an excess judgment entered against its insured.

We recognize that a judgment entered against a participating ***public entity*** in excess of $2,000,000 would yield little fodder for a bad faith failure to settle claim in

---

[28]As previously noted, the cap set forth in section 537.756.1 is subject to annual indexed adjustment as provided in section 537.756.2.  In addition, section 537.730.8 provides that the board has the authority to "procure insurance covering participating public entities and their officers and employees for amounts in excess of the amount specified by section 537.756 per occurrence for liabilities covered by the fund."

light of section 537.610.2, which limits the liability of ***public entities*** on claims where sovereign immunity has been waived to the same $2,000,000 payment cap imposed on MOPERM by section 537.756.1.  However, that is not the case where an excess judgment is entered against an officer or employee of a participating public entity.  As we have already explained, officers and employees of public entities do not enjoy the protection of section 537.600.1 sovereign immunity; of section 537.610.2's "cap" on recovery for claims as to which sovereign immunity has been waived; or of section 537.610.3's prohibition on punitive damages.  "[T]he limitation on liability where sovereign immunity is waived applies only to the public entity and not to an agent of the entity." *Cottey*, 24 S.W.3d at 129 (citing *Trimble*, 745 S.W.2d at 675).

MOPERM's contention that it was entitled to summary judgment because it has already paid the maximum amount it was authorized to pay for all claims arising out of a single occurrence is without merit as a matter of law and could not have served as an alternative basis for the trial court's grant of summary judgment.  MOPERM's liability for bad faith breach of the duty to settle within policy limits, and the damages flowing from that breach, remain to be determined.  *See Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 94 (Mo. App. W.D. 2005) ("Missouri law provides that where an insurer has 'acted in bad faith in refusing to settle within the policy limits it [is] liable *in tort*, [] not negligence or breach of contract[,] to the insured for the entire resulting judgment against the insured, ***including that part in excess of the policy limits***.'" (emphasis added) (quoting *Landie v. Century Indem. Co.*, 390 S.W.2d 558, 563 (Mo. App. 1965)).

For the reasons herein explained, Estes's third point on appeal is granted.

## Conclusion

The trial court's Judgment granting summary judgment in favor of MOPERM and its board of trustees on Estes's claims for bad faith failure to settle and breach of fiduciary duty is reversed. We remand this matter to the trial court for further proceedings consistent with this Opinion.

*Cynthia L. Martin*
_____
Cynthia L. Martin, Judge

All concur